William BROWN, Jr., Appellant,

v.

UNITED STATES, Appellee,

and

Ronald L. Anderson, Appellant,

v.

United States, Appellee.

Nos. 98–CF–1481, 98–CF–1495.

District of Columbia Court of Appeals.

Argued Sept. 12, 2000.

Decided Feb. 1, 2001.

Dorsey Evans, Silver Spring, MD, for appellant, William Brown, Jr.

Francis D. Carter, Washington, DC, for appellant, Ronald L. Anderson.

Barbara J. Valliere, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Julieanne Himelstein, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and RUIZ, Associate Judges, and NEWMAN, Senior Judge.[*]

SCHWELB, Associate Judge:

A jury found Ronald L. Anderson, M.D., guilty of one count of obstruction of justice and one count of criminal contempt of court. Dr. Anderson's codefendant, William Brown, Jr., M.D., was convicted of one count of obstruction of justice. The charges which led to the prosecution of the defendants, each of whom is a physician, arose from the two men's alleged attempts to induce Mrs. M.W.J.,[1] who was a patient of both defendants, not to testify for the prosecution in a criminal case arising out of Dr. Anderson's alleged sexual abuse of Mrs. J. The abuse charge against Dr. Anderson was tried as a misdemeanor by the judge, sitting without a jury, at the same time as the other charges were tried to the jury. Dr. Anderson was acquitted of sexual abuse.

On appeal from their convictions, the defendants have asserted numerous claims of trial court error, several of which we find to be lacking in merit.[2] We conclude, however, that the trial judge unduly re-

---

[*] Associate Judge WASHINGTON was a member of the division that heard argument in this case. He subsequently recused himself, and Senior Judge NEWMAN was drawn to replace him.

1. In light of the nature of the case, we shall hereinafter refer to the complainant as Mrs. J.

2. We summarily reject Dr. Brown's claim that the evidence was insufficient to support his convictions, cf. Riley v. United States, 647 A.2d 1165, 1172 & n. 16 (D.C.1994), and the claim of both defendants, asserted for the first time on appeal, see In re S.K., 564 A.2d 1382, 1384 n. 2 (D.C.1989) (per curiam), that the obstruction of justice statute, D.C.Code § 22–722(a)(2)(A) (1996), is unconstitutionally vague. See United States v. Thompson, 76 F.3d 442, 452–53 (2d Cir.1996); cf. Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232 (1913) (Holmes, J.) ("the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree").

stricted certain defense expert testimony relevant to Mrs. J.'s credibility. In addition, the prosecutor made a number of improper arguments in closing and, especially, in rebuttal. Although the trial judge took some remedial action in response to two of the prosecutorial improprieties, we conclude that the measures taken could not fully dispel the severe prejudice to the defendants resulting from a fundamentally unfair presentation by the prosecutor.

In order to prove obstruction of justice, the government was required, *inter alia,* to establish beyond a reasonable doubt that the defendants acted corruptly with the intent to prevent Mrs. J. from giving, or to induce her to withhold, truthful testimony. *See* D.C.Code § 22–722(a)(2) (1996). Mrs. J.'s credibility was therefore critical to the proper disposition of the obstruction of justice charges. We conclude, under all of the circumstances, that the cumulative effect of the court's restriction of the expert testimony and of the prosecutor's improper argument was sufficiently prejudicial, especially on the issue of credibility, to require reversal of the defendants' convictions for obstruction of justice. We affirm Dr. Anderson's conviction of criminal contempt.

## I.

### THE TRIAL COURT PROCEEDINGS

A. *The events of December 3, 1996.*

This case began when Mrs. J., a grandmother in her fifties, complained that Dr. Anderson had sexually abused her during her visit to his office on December 3, 1996. Mrs. J. had made an appointment with Dr. Anderson, who had been treating her and her family for many years, because she was concerned that she might be developing glaucoma. After dilating her pupils, examining her eyes, and measuring the pressure within her eyeballs, Dr. Anderson diagnosed Mrs. J. as having "[b]orderline glaucoma[,] which means that we don't know that it's glaucoma yet." Dr.

Anderson prescribed glasses and gave Mrs. J. an appointment for a visual field test. He explained that such a test, which is designed to determine whether the patient's peripheral vision has been impaired, is the only way to "actually diagnose" glaucoma.

At trial, Mrs. J. testified that after Dr. Anderson completed his examination of her, he made crude and unwanted sexual advances. Specifically, she claimed that Dr. Anderson felt her breasts under her clothing, placed her hand on his penis, and ejaculated on her clothes. Mrs. J.'s trial testimony differed in significant respects from her earlier accounts, see pp. 546–547, *infra,* but she has insisted since December 3, 1996 that Dr. Anderson sexually abused her.

Dr. Anderson denied at trial that he molested or harmed Mrs. J. in any way. Dr. Anderson asserted that Mrs. J. attempted to engage him in a flirtatious or quasi-romantic conversation. According to Dr. Anderson, he declined to participate in such a discussion and changed the subject instead. In Dr. Anderson's defense, his former receptionist testified that, to her knowledge, nothing untoward occurred in the office on the day of the alleged offense. There was also evidence that at the conclusion of her appointment, Mrs. J. proceeded routinely to a nearby optician to order the spectacles that Dr. Anderson had prescribed.

After returning home, Mrs. J. telephoned her sister and told her of the alleged sexual abuse. The sister called the police, and Mrs. J. subsequently proceeded to the Metropolitan Police Department's Sex Branch and described the incident to Detective Ozell Richmond. Shortly thereafter, the United States filed a one-count criminal information against Dr. Anderson. On December 26, 1996, Dr. Anderson was arraigned on one count of misdemeanor sexual abuse, and he was released on his own recognizance. As a condition of his

release, Dr. Anderson was ordered to stay away from Mrs. J.

B. *Dr. Brown's January 2, 1997 visit to Mrs. J.'s home.*

Shortly after learning of the charges against him, Dr. Anderson contacted Dr. Brown, who had been Mrs. J.'s family physician for many years. It was Dr. Brown who had initially referred Mrs. J. to Dr. Anderson. Dr. Anderson informed Dr. Brown about Mrs. J.'s allegations. This conversation apparently precipitated a chain of events that led to the conviction of each defendant of obstruction of justice and of Dr. Anderson for criminal contempt of court. The precise nature of most of these events, however, was hotly contested at trial.

It is undisputed that, on January 2, 1997, in response to Dr. Anderson's call, Dr. Brown visited Mrs. J. at her home. All parties likewise agree that on that day, and in Dr. Brown's presence, Mrs. J. telephoned both the prosecutor in charge of her case and Detective Richmond to inform each of them that she wished to drop the charges against Dr. Anderson. It is also undisputed that Mrs. J. called the prosecutor again shortly after Dr. Brown left and explained that she did not really want to withdraw her allegations. The evidence is in conflict as to the other events that occurred during Dr. Brown's visit.

Mrs. J. and her daughter both testified that when Dr. Brown came to Mrs. J.'s home, he was accompanied by several other men, apparently doctors. According to Mrs. J., it was Dr. Brown who insisted that she drop the charges against Dr. Anderson, and he promised her money if she would agree to do so. Mrs. J. claimed that Dr. Brown offered her an envelope supposedly containing a large amount of cash. Mrs. J. testified that she disclaimed any interest in the money Dr. Brown offered to her. She told Dr. Brown that she

wanted only an apology. Mrs. J. insisted that she made the telephone calls to the prosecutor and detective under duress and only because she saw no other way to get rid of her unwelcome visitors.

Dr. Brown, in contrast, testified that he was alone when he visited Mrs. J. on January 2, 1997. He stated that his visit was motivated by his concern regarding Mrs. J.'s mental and emotional well-being. Dr. Brown apprehended that Mrs. J.'s charge of sexual abuse against Dr. Anderson might have resulted from her "fantasizing." He testified that on a prior occasion, Mrs. J. had related fantasies regarding an imagined sexual relationship with a prominent public figure. According to Dr. Brown, Mrs. J. was acting entirely on her own initiative when she asked the prosecutor to drop the charges against Dr. Anderson. He acknowledged, however, that after Mrs. J. made the telephone calls to the prosecutor and the police detective, he suggested to Mrs. J. that Dr. Anderson might be willing to pay her $500 as a "little gift" in order to compensate her for her "grief and suffering."

C. *The January 14, 1997 meeting at Dr. Brown's office.*

It is undisputed that on January 14, 1997, twelve days after Dr. Brown's visit to Mrs. J.'s home, Mrs. J., her husband, and her grandson visited Dr. Brown at his office. Shortly after the group arrived, they were joined by Dr. Anderson. Mrs. J., Dr. Brown, and Dr. Anderson all testified that Dr. Anderson offered to pray with Mrs. J. and that Mrs. J. angrily refused. At trial, however, they agreed on little else regarding this strange encounter.

According to her trial testimony, Mrs. J. believed that she had been invited to come to Dr. Brown's office to discuss her continuing migraine headaches. Mrs. J. testified that she did not expect to see Dr. Anderson at all.[3] She further stated that,

---

**3.** Mrs. J. also stated that, after she and her

family arrived at Dr. Brown's office, Dr.

after Dr. Anderson arrived, he had a conversation with her and her husband in which he apologized to Mr. J. for his conduct and offered Mrs. J. money to "pay me off, to get rid of me so that I wouldn't go to court." Mrs. J. claimed that Dr. Anderson offered her $500 "to leave town ... and stay until the court thing blow[s] over" and to induce her "not to talk to anyone from the DA's office; not ... to Detective Richmond or anyone else." According to Mrs. J., she called Dr. Anderson a rapist and rejected as absurd his suggestion that they pray together.

Dr. Brown testified that he arranged the meeting at Mrs. J.'s request for the express purpose of enabling Dr. Anderson to apologize to her, and that he had so advised Dr. Anderson in advance.[4] Dr. Brown agreed with Mrs. J. (but not with Dr. Anderson) as to one disputed fact, namely that, as soon as Dr. Anderson arrived, all those present, including Mrs. J. and Dr. Anderson, were together in Dr. Brown's waiting room. According to Dr. Brown, Dr. Anderson spoke to Mrs. J. for at least twenty minutes. Dr. Brown testified that the only discussion of money concerned the "little gift" for Mrs. J. that Dr. Brown had hoped to obtain for his patient from Dr. Anderson.

Dr. Anderson presented a third version of the events of January 14, 1997. He testified that he came to Dr. Brown's office solely in order to speak to Mrs. J.'s husband and to "calm him down." His purpose was to tell Mr. J. that he had heard "what's been going on, the trouble you've been going through with the detectives etcetera, and people harassing you." By his own account, Dr. Anderson knew that Mrs. J. would be in Dr. Brown's office, but he believed that she would not be in the same room with him; he expected to meet only with Mr. J. Nevertheless, and contrary to Dr. Anderson's claimed expecta-

tions, Mrs. J. and Dr. Brown both joined Dr. Anderson and Mr. J. in the room in which the two men were having their discussion. Dr. Anderson acknowledged that he then spoke with Mrs. J., that he described to her his humble origins and his profound respect for women, and that he offered to pray with her. He stated, however, that Mrs. J. rejected his suggestion that the two of them pray together. Dr. Anderson firmly denied that he was willing to pay Mrs. J. any money. He insisted, on the contrary, that "[t]he only thing I ever offered to her was prayer."

### D. *Mrs. J.'s tape-recorded conversation with Dr. Brown on May 27, 1997.*

Dr. Anderson's trial was initially scheduled for April 14, 1997, but it was continued until May 30, 1997 because counsel were unavailable on the original date. On May 27, 1997, Mrs. J. again visited Dr. Brown's office. This time, however, the government lawyers sought to ensure in advance that means would be available to resolve conflicting accounts of any relevant discussions between Dr. Brown and his patient. By prearrangement with the prosecutors, Mrs. J. was "wired" with equipment that recorded her conversation with Dr. Brown on tape. For the first time in her life (so far as the record shows), Mrs. J. had become an undercover agent for the government of the United States.

The audiotape of Mrs. J.'s conversation with Dr. Brown discloses that the two of them discussed the case against Dr. Anderson at considerable length. The focus of the discussion was Dr. Anderson's trial, which was scheduled to begin three days later. Dr. Brown asked Mrs. J. several times whether she planned to testify. He indicated that it would be helpful to Dr. Anderson, and would "make a difference," if Mrs. J. did not show up. Mrs. J. as-

---

Brown asked the other waiting patients to leave and to return later. Dr. Brown, on the other hand, testified that he had seen his last patient that day at 12:30 p.m., well before the J.s got there.

4. Dr. Brown also indicated that he hoped that such a meeting would be "cathart[ic]."

sured Dr. Brown that she did not intend to go to court. For her part, Mrs. J. inquired rather insistently when she would receive the money that had allegedly been promised to her. Dr. Brown told Mrs. J. that she would be paid as soon as the case against Dr. Anderson was finally terminated. Dr. Brown explained that the charges would be dismissed if Mrs. J. did not appear in court on May 30. He assured her that "you will" get the money, but he warned her that she should "just keep your mouth shut." Dr. Brown also told Mrs. J. that he had received a letter from the United States Attorney's office. He apprehended that the government could charge him with obstruction of justice because of his conversations with Mrs. J. regarding whether or not she was going to testify.

On May 30, 1997, by pre-arrangement with the government attorneys, Mrs. J. did not appear in court for Dr. Anderson's trial. As a ruse, the prosecutor then moved to dismiss the charges against Dr. Anderson.

### E. *Mrs. J.'s recorded meeting with Dr. Brown on June 12, 1997.*

On June 12, 1997, in the wake of the contrived dismissal of the sexual abuse charge, Mrs. J., who was once again wired with recording equipment, paid her last relevant visit to Dr. Brown's office.[5] Dr. Brown told Mrs. J. that on June 3, 1997, he had received a letter from the prosecutors directing him to appear before the grand jury that was investigating possible obstruction of justice in relation to the events at issue here. Dr. Brown was obviously upset, for he had become a "target" of the investigation. He complained that Mrs. J. must have been talking to the prosecutors. Mrs. J. again inquired when she would receive her money, and Dr. Brown indicated that she would be paid as soon as things calmed down.

### F. *The indictment.*

On October 23, 1997, the grand jury returned a seven-count indictment against Dr. Anderson and Dr. Brown. The defendants entered pleas of not guilty to all charges. The misdemeanor sexual assault count was tried by the judge. All of the other charges were tried by the jury. The following table reflects the charges against the defendants arising out of the various incidents, as well as the disposition of each charge:

| Date of Offense | Charge(s) | Persons Charged | Disposition |
| --- | --- | --- | --- |
| December 2, 1996 | Misdemeanor Sexual Abuse | Dr. Anderson | Not guilty |
| January 2, 1997 | Bribery (D.C.Code § 22–713(a)) | Dr. Brown | Not guilty |
| | Obstruction of Justice (D.C.Code § 22–722(a)) | Dr. Brown | (Mistrial, hung jury) |
| January 14, 1997 | Bribery | Dr. Anderson | Not guilty |
| | | Dr. Brown | Not guilty |
| | Obstruction of Justice | Dr. Anderson | Guilty |
| | | Dr. Brown | Not guilty |
| | Criminal Contempt (D.C.Code § 23–1329(a)) | Dr. Anderson | Guilty |
| May 27, 1997 | Obstruction of Justice | Dr. Brown | Guilty |

Each defendant filed a timely motion for a new trial, but the judge denied the motions. These appeals followed.

## II.

## LEGAL DISCUSSION

### A. *The restriction of expert testimony for*

---

5. Between the January 14, 1997 and May 27, 1997 meetings, and again after her June 12, 1997 visit, Mrs. J. continued to visit Dr. Brown's office or to communicate with him concerning her medical needs.

*the defense.*

(1) *The excluded evidence.*

Dr. Anderson contends that the trial judge unduly restricted the testimony of David Ijeh, M.D., who was Mrs. J.'s psychiatrist during most of the period relevant to this case. In his brief, counsel for Dr. Brown has adopted Dr. Anderson's argument on this point.[6]

Dr. Ijeh testified both as a fact witness and as an expert witness for the defense.[7] He related that he had seen Mrs. J. on December 30, 1996, on January 28, 1997, on April 8, 1997, and on June 9, 1997. During this period, Mrs. J. had complained of auditory hallucinations (hearing imaginary voices), visual hallucinations (seeing imaginary things, including, *e.g.,* shadows and mice), and depression. Dr. Ijeh prescribed a number of medications, including Prozac, Resperidol, Mellaril, and Sinequan. Mrs. J. testified, however, that in spite of her continuing complaints of hallucinations and depression, she did not take these medicines as prescribed by Dr. Ijeh. Instead, she turned the prescriptions over to the prosecutors.

While Dr. Ijeh was on the witness stand, government counsel asked for leave to approach the bench and requested a proffer from Dr. Anderson's attorney as to the nature of the proposed expert testimony. Dr. Anderson's attorney stated that Dr. Ijeh would give "the diagnosis he reached from talking to [Mrs. J.]." This diagnosis, according to counsel, would be "schizoid affect[ive] disorder." *Id.*[8] The judge inquired why Dr. Ijeh's diagnosis was rele-

vant. Counsel argued that "I have a right to bring out from this man why he prescribed medicine, what was the reason." The judge disagreed:

> I don't see why you have a right to present it. You can certainly bring out that he prescribed medicine. You can bring out things, the kind of things you wanted to bring out, that she reported to him that she was hallucinating, but you can't—I don't want the label. I think it's a loaded label that has zero probative value.

Dr. Anderson's attorney insisted that "there's a reason that he's prescribing medication. He just [is] not doing it willynilly." The judge responded that "[t]he issue in the case isn't whether she was properly prescribed medication," and he stated that "I'll qualify him as an expert *with the understanding we're not going to be getting into diagnosis."* (Emphasis added.)

It was perhaps arguable, at this point, that the judge was excluding only the label—"schizoid affect[ive] disorder"—rather than the condition which the forbidden label described. It soon became apparent, however, that the judge's ruling was not confined to a prohibition against the mention of the medical name of Mrs. J.'s affliction. Dr. Ijeh was permitted to testify that he prescribed Prozac and other medications for Mrs. J., but the judge repeatedly sustained the prosecutor's objections to defense questions as to why Dr. Ijeh prescribed these medications and even as to what the medications were used for.[9] Dr. Anderson's attorney ultimately complained

6. In this court, each defendant has adopted the arguments made on appeal by his codefendant.

7. *See Eason v. United States,* 704 A.2d 284 (D.C.1997) (en banc) (per curiam) (overruling prior authorities and holding that the same witness may give both lay and expert testimony).

8. The term schizoid means "[s]chizophrenic." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1614 (3d ed.1992). Schizo-

phrenia is defined as "[a]ny of a group of psychotic disorders usually characterized by withdrawal from reality, illogical patterns of thinking, delusions, and hallucinations, and accompanied in varying degrees by other emotional, behavioral, or intellectual disturbances." *Id.; see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1177 (26th ed.1981).

9. Dr. Ijeh was permitted to testify that he had a medical basis to prescribe these drugs, but not to explicate that basis.

that "the exclusion of [Dr. Ijeh's] observations ...—why he prescribed medication[,] and what the medication is for[—]is harming me in my right to cross[sic] examination." He argued that the prohibited direct examination was "directly relevant to this woman and her ability to perceive[,] her cognitive effects[,] and her ability to testify about those events." The judge adhered to his prior ruling.

### (2) *The standard of review.*

█ The decision whether to admit or exclude expert psychiatric testimony is confided to the trial court's sound discretion. *E.g., In re Melton,* 597 A.2d 892, 897 (D.C.1991) (en banc). "An exercise of discretion must[, however,] be founded upon correct legal standards." *Teachey v. Carver,* 736 A.2d 998, 1004 (D.C.1999) (citation omitted); *see generally Johnson v. United States,* 398 A.2d 354, 363–67 (D.C.1979). "A [trial] court by definition abuses its discretion when it makes an error of law." *Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

### (3) *Applicable substantive principles.*

The defendants in this case could properly be convicted of obstruction of justice only if the prosecution proved, beyond a reasonable doubt, that the defendants had the intent to induce Mrs. J. to withhold, or to prevent her from giving, truthful testimony. D.C.Code § 22–722(a)(2). Mrs. J.'s credibility was therefore a critical issue in the case. The defendants contend that the trial judge's restriction of Dr. Ijeh's testimony prevented them from presenting to the jury probative evidence which would have shed light on Mrs. J.'s credibility or lack thereof. They claim that although Dr. Ijeh was permitted to testify as a fact witness, he was effectively precluded from giving any meaningful expert testimony. We discern merit in the defendants' position.

At the first trial, half a century ago, of Alger Hiss, the trial judge ruled that psychiatric testimony was relevant and admissible to shed light upon the credibility, or lack thereof, of Hiss' accuser, Whittaker Chambers. *United States v. Hiss,* 88 F.Supp. 559, 559–60 (S.D.N.Y.1950). This was apparently the first ruling on the issue by a federal court, but the court cited a number of analogous state court precedents in support of its decision. *Id.* Five years later, Connecticut's Supreme Court of Errors, relying, *inter alia,* on *Hiss* and authorities there cited, was able to declare that "there can be little doubt that psychiatric testimony is admissible to impeach credibility." *Taborsky v. State,* 142 Conn. 619, 116 A.2d 433, 438 (1955). There is now ample case law supporting that proposition. *See, e.g., Vereen v. United States,* 587 A.2d 456 (D.C.1991) (per curiam) (where a prosecution witness "had been diagnosed as schizophrenic" and had reported "vapors," *i.e.,* "fluorescent auras ... that appeared over people's heads," *id.* at 457, but where she was able to respond normally to questions during *voir dire* and was able to function as a student and as an employee, *id.,* "the trial judge was ill-equipped[, without expert testimony,] to determine whether the 'vapors,' premonitions, and any other irregularities were harmless aberrations or might, in some way, bear on her perception, recollection, or ability to distinguish fact from unreality," *id.* at 458); *People v. Neely,* 228 Cal. App.2d 16, 39 Cal.Rptr. 251, 253 (1964) (in rape prosecution, it was error to exclude expert testimony regarding the effects of mental illness on the credibility of the complaining witness); *People v. Borrelli,* 624 P.2d 900, 904 (Colo.Ct.App.1980) (holding that the trial court erred in excluding medical testimony regarding the principal prosecution witness' "organic brain syndrome," because "[mental] incapacity of a witness is clearly admissible for the purpose of impeachment, since it bears directly upon the question of credibility") (quoting *People v. Schuemann,* 190 Colo. 474, 548 P.2d 911 (1976) (alteration in original)); *cf. United States v. Lindstrom,* 698 F.2d 1154, 1163–66 (11th Cir.1983) (where the

chief prosecution witness suffered from mental illness which manifested itself in violent threats and bizarre conduct, the trial court erred in denying the defendant access to psychiatric materials); and *see generally* 3A JOHN HENRY WIGMORE, EVIDENCE § 932 (James H. Chadbourn ed., 1970 & Supp.2000).

In the present case, Dr. Ijeh was allowed to tell the jury about Mrs. J.'s visual and auditory hallucinations and her depression. He was not permitted, however, to explain the nature of the condition from which she was suffering, or the purpose of the medications which he had prescribed and which Mrs. J. had apparently declined to take. Dr. Ijeh was thus precluded from expressing an opinion regarding how Mrs. J.'s illness, and in particular her failure to take her medicine as directed, were likely to affect her ability to observe and recall accurately, and to describe truthfully, the events regarding which she was testifying. A similar restriction was held to be error in *Vereen, supra,* 587 A.2d at 457–58.

To be sure, the jurors knew that Mrs. J. had been hearing imaginary voices and seeing things that were not in fact there. But these symptoms alone, even if unexplained, did not necessarily render her testimony incredible. As the Supreme Court had occasion to observe more than a century ago, "Martin Luther believed that he had a personal conflict with the devil; Dr. Johnson was persuaded that he had heard his mother speak to him after death ... [and] Socrates ... had one spirit always prompting him." *District of Columbia v. Arms,* 107 U.S. 519, 524, 2 S.Ct. 840, 27 L.Ed. 618 (1883) (citations omitted). All of these august figures might nevertheless have proved to be believable and persuasive witnesses in a court of law. Mrs. J.'s credibility could have been more effectively evaluated if the jurors had heard expert testimony regarding the nature and origin of her symptoms, the condition from which

she suffered, and the consequences of her affliction upon her ability to observe and relate accurately the events which generated the prosecution of these defendants.

In *People v. Neely, supra,* a physician called as an expert witness by the defense was prepared to testify that the complainant, a mental patient at Napa State Hospital, had poor judgment and comprehension. 39 Cal.Rptr. at 253. He proffered that although "I don't believe she wilfully lies, ... I believe she's given to exaggerations due to misapprehensions, fears[,] and lack of understanding as to what is actually intended by other people." *Id.* The trial judge excluded the proposed testimony. The appellate court held that the evidence should have been admitted:

> While the jury had been told that Delores' general reputation for truth, honesty and integrity was bad, *the appellant was also entitled to have the jury informed of the mental and emotional instability of the prosecuting witness through the expert medical testimony of the doctor in charge of her case.* The jury was entitled to hear such testimony and to have it before them [sic] as an aid in evaluating [Delores'] testimony.

*Id.* (emphasis added). Although the *Neely* decision may be subject to criticism on other grounds,[10] we believe that the quoted passage is consistent with this court's approach in *Vereen,* reflects a correct analysis of the issue before us, and constitutes persuasive authority in the case at bar.

We do not suggest that the trial judge was required to permit Dr. Ijeh to use the phrase "schizoid affect[ive] disorder" in describing Mrs. J.'s condition. If the judge viewed this nomenclature as unnecessarily alarming and prejudicial, it was within his discretion to require the use of less inflammatory terminology. We hold, however, that the defendants were entitled to elicit from Dr. Ijeh his expert opinion both regarding the substance of what was wrong

10. The court appeared to believe that the testimony of a complainant in a rape case should be subject to more searching scrutiny and impeachment than the evidence given by a complaining witness in a different kind of case. *Neely, supra,* 39 Cal.Rptr. at 253.

with Mrs. J. and regarding the effects of her illness and of her failure to take prescribed medication on the reliability of her testimony.[11]

### B. *Improper prosecutorial argument.*

#### (1) *The prosecutor's obligation.*

At the conclusion of the government's rebuttal argument, Anderson's attorney orally moved for a mistrial or, in the alternative, for leave to present surrebuttal. Counsel claimed that the prosecutor's closing, and especially her rebuttal, contained numerous improper arguments which, collectively, deprived his client of a fair trial. The judge found a number of counsel's claims persuasive, and he made it clear to the prosecutor that in several instances she had crossed the line. The judge also agreed to take certain remedial measures in response to two of the prosecutor's improprieties, and he in fact did so at the beginning of his charge to the jury. The defendants contend, however, that the steps taken by the judge were insufficient to cure the prejudice, and they insist that the prosecutor's actions were sufficiently severe to warrant reversal of the defendants' convictions.

In *Bertolotti v. State,* 476 So.2d 130, 134 (Fla.1985) (per curiam), the Supreme Court of Florida "aptly explained," *Dixon v. United States,* 565 A.2d 72, 77 (D.C. 1989), that

> [t]he proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence. Conversely, it must not be used to inflame the minds and passions of the jurors so that their verdict reflects an

emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.

In the present case, to use Hamlet's phrase, the true purpose of closing argument, as described above, was "[m]ore honour'd in the breach than the observance." In our view, the resulting danger of prejudice was sufficient to undermine confidence in the defendants' convictions of obstruction of justice.

#### (2) *The standard of review.*

■ At the conclusion of the prosecutor's rebuttal, Dr. Anderson's attorney asked the judge to declare a mistrial on the basis of improper prosecutorial argument. This motion was timely, *see Coreas v. United States,* 565 A.2d 594, 600 (D.C. 1989), "for a contrary rule would encourage disruptive interruptions of the prosecutor's closing." *Irick v. United States,* 565 A.2d 26, 32 n. 13 (D.C.1989). The decision whether to declare a mistrial on these grounds is confided to the discretion of the trial court. *E .g., Lee v. United States,* 562 A.2d 1202, 1204 (D.C.1989). To determine whether there has been an abuse of that discretion, we consider "the closeness of the case, the centrality of the issue affected by the [improper argument], and the steps taken to mitigate the effects [thereof]." *Powell v. United States,* 455 A.2d 405, 411 (D.C.1982).

■ On appeal, the defendants reiterate the contentions made by Dr. Anderson's counsel in his motion for a mistrial, but they also assert that the prosecutor made certain impermissible remarks to which the defendants failed to object at trial.

**11.** The government contends that the defendants did not make a sufficient proffer in the trial court to preserve for appeal the issue that they now raise with respect to the restriction of Dr. Ijeh's proposed evidence. Although we agree that defense counsel were not as precise as they might have been in describing the content of Dr. Ijeh's proposed testimony and the purpose for which they sought its introduction, we are of the opinion

that the exchanges between the judge and Dr. Anderson's attorney, set forth in detail in Part II A(1), *supra,* placed the court and the prosecutor on fair notice of the nature of the defense claim. *See Yee v. City of Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (where the underlying claim has been properly preserved, the parties are not limited to the precise arguments they made below).

They contend that these alleged improprieties, in conjunction with other claimed errors by the trial court, warrant reversal of the defendants' convictions. As to statements by the prosecutor to which no timely objection was made, we must decide whether the judge committed plain error, *see Coreas, supra,* 565 A.2d at 600, by failing to intervene, *sua sponte,* in order to correct or strike any erroneous or improper argument. *E.g., Parker v. United States,* 757 A.2d 1280, 1289 (D.C.2000).

### (3) *Misstatement of the law.*

■ Dr. Anderson argues, for the first time on appeal, that the prosecutor misstated the applicable law in a critical respect. We agree.

Since 1993, the District's obstruction of justice statute has provided, *inter alia,* that a person commits that offense if he

[k]nowingly ... threatens or corruptly persuades [or] ... endeavors to influence, intimidate, or impede a witness ... in any official proceeding, with intent to:

A. Influence, delay, or prevent the *truthful testimony* of the [witness] in an official proceeding, [or]

B. Cause or induce the [witness] to withhold *truthful testimony* ... from an official proceeding....

D.C.Code § 22–722(a)(2) (emphasis added). In this case, the testimony at issue was Mrs. J.'s claim that Dr. Anderson sexually abused her on December 3, 1996. In order to show that either defendant obstructed justice, the prosecution was therefore required to prove that his intent was to prevent Mrs. J. from giving, or to induce her to withhold, truthful testimony regarding the alleged abuse.

At the beginning of her rebuttal, the prosecutor broached for the first time the relationship, if any, between the sexual abuse charge (which was being tried by the judge) and the remaining counts of the indictment.[12] The prosecutor stated:

Ladies and gentlemen, first of all, it does not matter legally whether or not you believe that the sexual assault [13] occurred. It does not matter, and the [c]ourt is going to tell you, that has nothing to do with whether or not they committed the other crimes.

In other words, according to government counsel, the defendants could properly be convicted of the felony offenses with which they had been charged, including obstruction of justice, regardless of whether their intention was to prevent or inhibit false, rather than truthful, testimony by Mrs. J.

The government has not made a serious attempt to defend the prosecutor's argument on this point. The judge explicitly instructed the jury, with respect to the obstruction of justice counts, that the government was required to prove beyond a reasonable doubt, *inter alia,*

that the defendant knowingly and with specific intent corruptly endeavored to, one, influence, delay or prevent the *truthful* testimony of [Mrs. J.]; or, two, cause or induce [Mrs. J.] to withhold *truthful* testimony.

(Emphasis added.) The government argues that the foregoing instruction was correct and cured any mischief done by the prosecutor's representation that the truth or falsity of the allegation of sexual abuse was irrelevant.[14]

---

12. In her initial closing argument, the prosecutor set forth her understanding of the elements of obstruction of justice without mentioning the statutory reference to "truthful testimony." She stated, however, that the prosecution must prove that the defendant acted "corruptly." See note 31, *infra.*

13. Although Dr. Anderson was charged with "sexual *abuse,*" the prosecutor consistently used the term "sexual *assault.*" (Emphasis added.)

14. In the trial court, the government did not object to the court's instruction. The government similarly acknowledges on appeal that the jury was "properly instructed" and that the prosecution was appropriately required to prove, as an element of obstruction of justice, that Mrs. J.'s proposed testimony was truth-

Neither defendant objected to the remark in question, and we therefore review for plain error the judge's failure to intervene on his own initiative. "Under the plain error standard, [the defendants] ha[ve] the formidable burden of showing that the trial court's error was plain or obvious and that the error resulted in a clear miscarriage of justice." *Perkins v. United States*, 760 A.2d 604, 609 (D.C. 2000) (citations and internal quotation marks omitted).

The prosecutor's assertion that "it does not matter legally whether or not [the jury] believe[d]" the sexual abuse occurred cannot logically be squared with the use of the word "truthful" in § 22–722(a). See note 14, *supra*. If the jurors believed that Mrs. J.'s accusations were untrue, they could likewise infer that the defendants' intent was not to prevent truthful testimony. The prosecutor's argument was therefore misleading, and it would have been appropriate for the judge to interrupt the prosecutor, and to correct her legal error even in the absence of a defense objection. "When counsel misstates the law, the better practice is for the court to intervene promptly and to correct the misstatement." *Thomas v. United States*, 557 A.2d 1296, 1304 (D.C.1989).

It does not necessarily follow, however, that the judge's failure to intervene, standing alone, brought about the kind of clear miscarriage of justice that is contemplated by the plain error doctrine. The government asserts that the judge correctly instructed the jurors with respect to the elements of obstruction of justice. "Arguments of counsel which misstate the law

are subject to objection and to correction by the court," *Boyde v. California*, 494 U.S. 370, 384, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), and "one would presume that the jury applied the law as stated by the judge, not by the prosecutor." *Allen v. United States*, 603 A.2d 1219, 1224 (D.C. 1992) (en banc) (citing *Boyde, supra*, 494 U.S. at 385, 110 S.Ct. 1190).

Nevertheless, government counsel's incorrect representation of a key point of law must properly be a part of our overall calculus. "[W]here the case is close, prejudice [from improper prosecutorial argument] cannot be avoided by mild judicial action." *King v. United States*, 125 U.S.App. D.C. 318, 331, 372 F.2d 383, 396 (1966) (quotation marks omitted). Here, the erroneous characterization of the applicable law came at the outset of the prosecutor's rebuttal, when the jury's attention may well have been at its peak. The judge's instruction as to the elements of obstruction of justice, on the other hand, came well into the judge's charge. Moreover, although the logic of the judge's instruction cannot be reconciled with the prosecutor's claim that the truth or falsity of Mrs. J.'s allegations of sexual abuse was irrelevant to the remaining counts of the indictment, the instruction did not explicitly address the connection between the requirement of "truthful testimony," D.C.Code § 22–722(a)(2), and Mrs. J.'s account of the alleged sexual abuse. See note 14, *supra*. Not every juror is trained in abstract logic and, in the absence of a prompt and explicit correction of prosecuting counsel's misstatement, the possibility cannot be overlooked that the jury misun-

---

ful. Given the government's position, we do not explore, for purposes of this case, other hypothetical constructions of the statute for which no party has contended. We note, for example, that the statute uses the phrase "truthful testimony" in relation to the defendant's intent, D.C.Code § 22–722(a)(2), but we have no occasion to decide whether the statute could be violated even if a witness' testimony were false, so long as the defendant believed it to be truthful and corruptly attempted to thwart it. *Cf.* COUNCIL OF THE DIS-

TRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL NO. 9–385, THE "LAW ENFORCEMENT WITNESS PROTECTION AMENDMENT ACT OF 1992," at 3 (May 20, 1992) ("The word 'truthfully' is inserted in the Committee Print where testimony is referenced to address those situations where a person was not dissuaded from testifying, but was dissuaded from testifying honestly and accurately."). In any event, Mrs. J.'s credibility would remain relevant regardless of the precise import of the reference in the statute to "truthful testimony."

derstood an essential point of law. That danger would have been avoided if the judge had intervened immediately after the erroneous statement was made, and if he had explained to the jury that the prosecutor's legal theory was incorrect and that the government was required to prove, as an element of obstruction of justice, that the defendants' intent was to prevent Mrs. J. from giving truthful testimony, and not false testimony, regarding the December 3, 1996 incident.

In extreme cases, arguments of counsel which misstate the law have been held to warrant reversal even where the judge's subsequent instructions to the jury were correct. In *Thomas, supra,* 557 A.2d at 1301–05, for example, the prosecutor had misstated a critical element of the offense of malicious destruction of property. The defense initially objected to the erroneous statement, but counsel failed to press the trial judge for any specific corrective action. The judge ultimately instructed the jury, without objection and in accordance with the "Redbook," [15] regarding the elements of the offense. This court held in

*Thomas* that the judge's reading of the Redbook instruction, although correct as a matter of law, did not sufficiently counteract the effects of the prosecutor's explicit misstatement, and the defendant's conviction was reversed. 557 A.2d at 1304–05.

In the present case, we likewise conclude that even after the judge had instructed the jury as to the elements of obstruction of justice, there remained some potential for prejudice. We need not decide, however, whether, standing alone, the prosecutor's incorrect representation and the judge's initial failure to intervene would require reversal under the plain error doctrine, for this claim of error does not stand alone.

### (4) *Misstatement of the record.*

 The defendants also contend that on several occasions, the prosecutor misrepresented the record, sometimes in an inflammatory way. The trial judge agreed with the defense regarding at least two such episodes, and he took appropriate corrective action.[16] The departure from

---

15. Criminal Jury Instructions for the District of Columbia (3d ed .1978).

16. During his closing argument, Dr. Brown's attorney pointed out to the jury that Mrs. J.'s account of the January 14 incident was uncorroborated even though her husband was present. Mr. J. was not called as a witness. In response, the prosecutor asked rhetorically "But do you know whether or not he's sick, very sick?" There was no evidence that Mr. J. was ill, and Dr. Anderson's counsel complained that the prosecutor's rhetorical question lacked support in the record. The judge agreed that the prosecutor had "suggested out of thin air that maybe [Mr. J.] was sick," and he opined that it was improper for her to do so.

At the beginning of his charge, the judge told the jurors that "[t]here is no evidence before you as to why [Mr. J.] did not appear as a witness[,] and the jury should not speculate as to why he did not appear." The foregoing instruction may have been less than a complete corrective, *cf. Harris v. United States,* 602 A.2d 154, 161–62 (D.C.1992) (en banc) (missing witness argument), but under all of the circumstances, we perceive no basis for reversal on this ground.

During her rebuttal argument, the prosecutor also asserted that while Mrs. J. was testifying, Dr. Anderson had "turn[ed] away smugly[,] laughing." Although Mrs. J. had insisted from the witness stand that Dr. Anderson should look at her, there was no record support for the assertion that Dr. Anderson was laughing or otherwise acting "smugly." During the discussion between court and counsel regarding the defense request for a mistrial, the judge questioned the propriety of the prosecutor's remark, noting that he had not been watching Dr. Anderson 'at the time and that he had "no idea" whether or not government counsel's characterization was a fair one. The judge ultimately instructed the jury that the prosecutor's remarks "regarding the demeanor or behavior of the defendants as they sat in the courtroom ... [were] improper and you should disregard those comments."

We agree with the judge that the prosecutor's remarks were inappropriate. In effect, government counsel gave unsworn testimony regarding Dr. Brown's conduct and demeanor. Her assertions on the subject were not subject to cross-examination by the defense. The trial judge's instruction to the jury, however, included an implied rebuke to the prosecutor, and we believe that this was a

the record by government counsel that we regard as most serious, however, was not mentioned at all in Dr. Anderson's motion for a mistrial. We refer to the prosecutor's repeated insistence that Mrs. J. was "going blind."

There appears to be no dispute between the parties regarding the result of Dr. Anderson's examination of Mrs. J. His diagnosis of Mrs. J.'s condition, evidently based on Dr. Anderson's measurement of Mrs. J.'s intraocular pressure (IOP), was "[b]orderline glaucoma ." Dr. Anderson testified without contradiction that he could not determine whether Mrs. J. was actually suffering from glaucoma until his patient had undergone a visual field examination. Furthermore, even though "[t]he effects of glaucoma cannot be reversed, ... the progress of the disease can be stopped; if detected early in its course, medication, surgery, or a combination of treatments usually keep glaucoma under control and save the patient's sight." David Kaufman, M.D. & Carey Fitzpatrick, *Glaucoma* (1998), *in* 8 ATTORNEYS' TEXTBOOK OF MEDICINE § 53.00(MB) (Roscoe N. Gray, M.D. & Louise J. Gordy, M.D., LL.B. eds., 3d ed.2000). Therefore, even if a visual field test were to reveal some impairment of Mrs. J.'s range of vision—and no such test had yet been conducted—then there indisputably remained ample weapons in an eye doctor's arsenal, including, *inter alia*, eye drops and laser surgery, to protect Mrs. J.'s eyesight. *See* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 735–37 (Mark H. Beers, M.D. & Robert Berkow, M.D. eds., 17th ed.1999) (hereinafter MERCK MANUAL). There was certainly no evidence before the jury that Mrs. J. was going blind, or indeed that she was ever likely to do so.

The fact that glaucoma, and especially "borderline glaucoma," is treatable is easi-

ly determinable from unimpeachable sources. "The goal of medical, laser, or surgical therapy is to prevent glaucomatous optic nerve and visual field damage by stabilizing the IOP." MERCK MANUAL, *supra*, at 735. Furthermore, "laser therapy[,] ... surgery" or "a lifelong regimen [of] ... medications" "are almost equally effective" at achieving the "reduction of intraocular pressure to the normal range." Kaufman & Fitzpatrick, *supra*, at §§ 53.91, 53.120(10). If a medical regimen is employed, it must be accompanied by "examination three times a year" to ensure that it effectively controls glaucoma. *Id.*, § 53.91. In the present case, Mrs. J.'s IOP was apparently borderline, and no medication had as yet been prescribed. The notion that she was "going blind" was therefore completely unwarranted.

Nevertheless, the prosecutor proclaimed on five separate occasions during her rebuttal argument that Mrs. J. was losing her eyesight:

1. *"The woman is going blind."*

2. *"The woman is going blind."*

3. "This is a woman who needs a visual field examination. *She is going blind."*

4. "People who[m] she loved, respected, looked up to, embraced, neede[d,] ... she needed him. *She's going blind."*

5. "I asked ... the optician whether or not [Mrs. J.] bought lenses and frames, which, of course, only makes sense *since the woman is going blind.* Yes, she bought lenses."

(Emphasis added.)

This allegation during rebuttal came completely "out of the blue ." The notion that Mrs. J. was going blind had not been mentioned by any witness during the trial or by any attorney during the three closing arguments that preceded the prosecu-

reasonable and measured response to an impermissible argument. Even so, there may have been some lingering prejudice from the prosecutor's stated personal impression of the defendant's demeanor, for "if you throw a skunk into the jury box, you can't instruct the jury not to smell it." *Dunn v. United States,* 307 F.2d 883, 886 (5th Cir.1962) (internal quotation marks omitted). It may not have been easy for the jurors to forget or ignore what government counsel had told them about Dr. Brown's comportment.

tor's rebuttal.[17] Yet the prosecutor did not allude to the loss of Mrs. J.'s eyesight as a hypothetical possibility, or as a danger, or as something Mrs. J. feared. On the contrary, on five separate repetitions, counsel for the government used the present tense: "She *is* going blind." (Emphasis added.)

Remarkably, neither defendant objected to any of the prosecutor's references to Mrs. J.'s supposed impending blindness, and the point was not included in the litany of complaints enumerated by Dr. Anderson's attorney when he asked the judge to declare a mistrial. In his post-judgment motion for a new trial, however, counsel for Dr. Anderson argued that the prosecutor's statements on this subject had "mischaracteriz[ed] the evidence"; that "[t]here was no evidence that [Mrs. J.] was, in fact, or remotely, going blind"; and that the prosecutor's assertion that she was going blind was "designed to inflame the jury." [18]

■ By the time Dr. Anderson's attorney raised this issue in his post-trial motion, the trial was over, and the objection came too late for the judge to communicate any corrective action to the jury. *Accord, Coreas, supra,* 565 A.2d at 600 (holding that a motion for mistrial based on improper prosecutorial argument was untimely when it was made two days after

the jury had commenced its deliberations). The trial judge's failure to intervene, *sua sponte,* is thus reviewable for plain error. *Id.*

The defendants were represented by experienced attorneys, and the judge's reluctance to interject himself into the proceedings when counsel did not complain was certainly understandable. Moreover, if an objection had been made, corrective steps could have been undertaken without derailing the entire trial.

Nevertheless, the introduction and repetition, without any evidentiary support, of the notion that Mrs. J. was going blind may have packed an enormous emotional wallop. Apprehension of blindness is surely one of any person's most devastating fears, and the prosecutor's intensive focus on the subject during her rebuttal argument had the potential for distracting the jury from a calm and detached evaluation of the evidence. Under the circumstances, we believe that the judge would have done well to call counsel to the bench upon the prosecutor's first allusion to Mrs. J.'s "going blind." A prompt correction of government counsel's misstatement could have effectively nipped the problem in the bud.[19] Although, standing alone, the judge's failure to intervene might not be sufficient to warrant setting aside the guilty verdicts,[20] we must surely take into

---

17. Mrs. J. did testify that an acquaintance who had suffered from glaucoma was now blind.

18. In his memorandum in support of his motion for a new trial, Dr. Anderson's counsel stated, in connection with the "going blind" issue, that "[t]he defense complained in a timely manner, the [c]ourt took no action, [and] Dr. Anderson was substantially prejudiced." At oral argument before this court, counsel contended that this issue should be treated as having been embraced in his "omnibus" objection to the prosecutor's alleged misrepresentations of the record and inflammatory statements. We have, however, found nothing in the record to support the assertion that the point was specifically preserved at trial.

19. We recognize, however, that an appellate court assessing the record in retrospect has the advantage of a "Monday morning quarterback" over the trial judge, who must make the decision to intervene *sua sponte* with little lead time. In this case, the judge may not have had any prior occasion to become aware of the availability of treatment for glaucoma, and he might not have realized, without the opportunity to do any research on the subject, that government counsel's dire proclamations about Mrs. J.'s condition were unfounded.

20. In its brief, the government describes the prosecutor's statement that Mrs. J. was "going blind" as "perhaps hyperbolic," and acknowledges—if this can be deemed an acknowledgment—that the prosecutor may have "technically exaggerated" Mrs. J.'s condition.

account the prosecutor's unfortunate fusillade—she's going blind, she's going blind, she's going blind, she's going blind, she's going blind—in determining whether the defendants received a fair trial.

> (5) *The prosecutor's other appeals to the passions of the jury, assaults on opposing counsel, and inflammatory rhetoric.*

The prosecutor's repeated insistence that Mrs. J. was going blind was an obvious plea to the emotions of the jury, but it was by no means the only such appeal. It is no exaggeration to state that the central theme of government counsel's entire closing argument, and especially of her rebuttal, was a not very subtle attempt to gain the jurors' sympathy for Mrs. J. (whom the prosecutor depicted as a poor and oppressed underdog) and to generate resentment against the defendants (whom she cast as rich, powerful and arrogant physicians who had no respect for the law and who felt nothing but contempt for their unfortunate victim). This theme reached its zenith at the conclusion of the rebuttal argument:

> Ladies and gentlemen, when all is said and done, you have Ronald Anderson and William Brown, and they have every advantage. They're physicians. They have education. They have fraternity. They have affiliations. They have wealth. They have everything anyone could want. Mrs. [J.], she's poor. She's

We do not agree that "going blind" is mere hyperbole, or that a juror lacking ophthalmological training is likely to be able to discount the phrase as only a slight embellishment of the record. Moreover, imminent blindness is more than a "technical exaggeration" of borderline, and as yet undiagnosed, glaucoma— the two conditions are, almost literally, as different as night and day.

21. The government appears to argue that the prosecutor was attempting to protect *Mrs. J.* from class prejudice *against her* . If that is so, then her focus on the wealth and social status of the defendants, rather than seeking fair treatment of all parties, simply invited prejudice against the defendants instead.

vulnerable. She has emotional baggage. She's wacky. She's a character. She has lots and lots of physical problems.

> But there is one thing, ladies and gentlemen, that Mrs. [J.] has that they don't. One. You know what that is? That's faith. She has faith in this, in him, in this system, in cross-examination, in court, in rules of law. She has faith that you will do your duty[,] and now I am asking you to do your duty and find the defendants guilty as charged.

Whatever counsel's subjective motivation may have been, the foregoing passage comes across as an undisguised appeal to class prejudice against the powerful and privileged defendants.[21]

■ The prosecutor also communicated to the jurors her not very complimentary personal opinion of the defendants, and in doing so, she sometimes tended to eschew nouns and verbs for adjectives and adverbs. She stated, for example, that it was Dr. Brown who did Dr. Anderson's "dirty work," while "Anderson stay[ed] smugly, quietly, invincibly, arrogantly in the background."[22] She attributed to Dr. Anderson a sense of "[i]nvincibility, the feeling that one is invincible, cannot be touched. Arrogance and control." Much of the argument was cast in a hostile and derisive tone which was directed not only against the defendants, but against Dr. Anderson's attorney as well.[23]

22. In another troubling portion of her rebuttal, the prosecutor all but accused Dr. Anderson, on the flimsiest evidence, of altering a "fishy" document to his own advantage.

23. For the reasons stated in Part II A of this opinion, the defendants were entitled to explore Mrs. J's. psychological condition, which could reasonably affect her credibility as a witness. The trial judge was by no means unduly permissive to the defense in this regard. See Part II A, *supra.* Nevertheless, during her rebuttal argument, at a point when defense counsel would not have an opportunity to respond, the prosecutor denounced Dr. Anderson's counsel in harsh and sarcastic terms:

The trial judge was apparently troubled by the emotional character of the prosecutor's argument, but he felt constrained to countenance it as permissible, or even inevitable, under the adversarial system:

> [S]omeone landing on Mars listening to these—or some intelligent person from somewhere else listening to the argument might well have said what are these trials about with all [these] theatrics, because it was, I agree with you, a very impassioned closing. And if I were designing a system, I certainly would not have arguments like that, but that's our adversary system and it encourages that sort of advocacy. I didn't, as I've said, other than a couple of points you mentioned, I didn't think it crossed the line and I didn't think the total effect was improper under our present system.

We appreciate the trial judge's commendable restraint and his unwillingness to convert his own personal notions of what closing arguments ideally ought to be permissible into rules of law. Nevertheless, we are unable to agree with the judge that the adversarial system, properly constrained, encourages the kind of advocacy

> Why do you think [Mrs. J.]'s seeing a psychiatrist in the first place? Because she was assaulted by a physician. But now that she's seeing a psychiatrist, let's trash her.
> Oh, Mr. Carter [Dr. Anderson's attorney] says, we're not going to denigrate her, but we're going to denigrate her. She was raped as a child. Let's tell the entire world. We're going to open up all of her psychological records and the deep and dark secrets that she told her psychiatrist.
> We're going to open up her medical. We know about her Xanax, her stomach problems, her headaches. I'm surprised we haven't heard about other deep dark medical secrets that would have disgusted us.
> We have heard everything. Can you imagine, ladies and gentlemen, walking in and saying, [g]uess what, this guy touched me on the breasts. Okay. Well, isn't it true that you saw a psychiatrist five years ago and that you're on this drug, that drug and that drug, and in 1982 you told me that you were raped by—
> Okay. We're not going to denigrate her, ladies and gentlemen. Don't think that we are. Dirt. Dirt. Dirt.

revealed by this record. It is true that "a criminal trial is not a minuet." *Taylor v. United States,* 134 U.S.App. D.C. 188, 189, 413 F.2d 1095, 1096 (1969). The prosecutor "may make a vigorous and forceful presentation of the government's case," and "broad bounds of rhetorical comment [are] permissible in closing argument." *Dixon, supra,* 565 A.2d at 77 (citations and internal quotation marks omitted). In our view, however, the prosecutor's rebuttal argument in this case went beyond rhetoric of the kind countenanced in our cases. Moreover, its prejudicial effect was compounded by the reality that most of the improprieties—the misstatement of the law of obstruction of justice, the reference to Mrs. J.'s impending blindness, the harsh attack on Dr. Anderson's attorney, the contrasting of "poor" Mrs. J. with the wealthy and powerful defendants, and the unleashing of uncomplimentary adjectives—occurred in rebuttal, when defense counsel no longer had the opportunity to respond. *Cf. Coreas, supra,* 565 A.2d at 600–04 & n. 8.[24] In our view, this is a case in which government counsel's argument compromised the fundamental fairness of the trial.[25]

> "*Ad hominem* attacks against opposing counsel are uncalled for and unprofessional." *Irick, supra,* 565 A.2d at 34. "Prosecutors cannot ... be permitted to convict defendants through an attack on their advocates." *Id.* at 48 (Newman, J., dissenting). In the present case, the prosecutor certainly had the right to object to defense counsel's cross-examination and to the psychiatric evidence as unduly intrusive. The trial judge found, however, that the cross-examination of Mrs. J. by counsel for Dr. Anderson was "entirely gentlemanly." In our view, government counsel's derisive verbal assault on Dr. Anderson's attorney for exercising his obligation to defend his client and to explore Mrs. J.'s credibility was altogether out of bounds.

24. The judge also denied the defense the right to present further argument in surrebuttal. *Cf. Coreas, supra,* 565 A.2d at 600 n. 9.

25. The defendants also made a number of other claims of improper prosecutorial argument. In light of our disposition of these appeals, we find it unnecessary to address them.

## C. *Harmless error analysis.*

The final question for our consideration is whether the cumulative impact of the restriction of Dr. Ijeh's testimony and of the prosecutor's improper arguments (as partially mitigated by the judge's actions) was sufficiently prejudicial to warrant setting aside the verdict of the jury. As to the obstruction of justice counts, we are constrained to answer this question in the affirmative.

As previously noted, the defendants could not properly be found guilty of obstruction of justice unless the government proved, beyond a reasonable doubt, that they intended to suppress truthful testimony. It is true that even if Dr. Anderson did not sexually abuse Mrs. J., the subsequent conduct of each of the defendants was, at best, highly questionable. Nevertheless, the obstruction of justice statute requires an intent to inhibit truthful testimony, D.C.Code § 22–722(a), and the case against both men turned decisively on Mrs. J.'s credibility. It was essential for the jurors to understand that if Mrs. J. was not sexually abused, then her proposed testimony that the abuse took place was not truthful, and there could be no conviction of obstruction of justice if the defendants did not intend to prevent or interfere with truthful testimony.

The exclusion of Dr. Ijeh's expert opinion regarding Mrs. J.'s condition went to a critical factual issue in the case, namely, whether Mrs. J.'s allegations of sexual abuse were credible. Because Dr. Ijeh was not permitted to explain the nature of Mrs. J.'s illness or the effect of her failure to take prescribed medications on her ability to perceive and recall events accurately and to relate them truthfully, the jurors were denied information which was critically important to their assessment of her credibility. The restriction of the expert testimony thus presented a substantial potential for prejudice against the defendants.

The prosecutor's erroneous representation to the effect that the jurors' evaluation of the merits of the government's sexual abuse case were irrelevant to the other charges against the defendants likewise had important potential consequences for the proper resolution of the obstruction of justice counts. Government counsel told the jury, in effect, that the defendants could be convicted of obstruction of justice even if the jurors did not believe Mrs. J.'s allegation that she had been sexually abused by Dr. Anderson, and thus, inferentially, even if the defendants did not intend to prevent truthful testimony. The consequences of this incorrect representation may have been partially palliated by the judge's subsequent charge regarding obstruction of justice, see page 22, *supra,* for we must presume that the jury follows the court's instructions. Common sense tells us, however, that without immediate and explicit correction of the prosecutor's erroneous statement, which led off her rebuttal argument, some appreciable danger of misunderstanding remained.

These two aspects of the case, without more, would lead us to question whether the obstruction of justice convictions may stand. But there was more—much more. The prosecutor attempted, by resort to inaccurate and sometimes intemperate statements, to generate sympathy for Mrs. J., but distaste and even revulsion against the defendants. She made repeated but unsupported assertions that Mrs. J. was "going blind." Focusing on the defendants' perceived wealth, power, and social prominence, government counsel, intentionally or not, invited prejudice against the defendants on the basis of their station in life. The prosecutor also denounced Dr. Anderson's attorney in the harshest terms. She expressed personal and uncomplimentary opinions of the defendants, resorting to pejorative adjectives and adverbs (*e.g.,* "dirty work," "smugly," "arrogantly"). These tactics generated more heat than light, and potentially distracted the jurors from their duty to resolve the dispositive issues of fact. Indeed, the prosecutor invited the jurors to feel pity for Mrs. J., but

resentment against the two physicians, and she asked the jurors, implicitly, to teach the defendants a lesson that they would not forget.

All of this happened in a case that was very close indeed on the issue whether the defendants intended to prevent or inhibit truthful testimony. Significantly, the judge, sitting as trier of fact, found Dr. Anderson not guilty of the sexual abuse count. Obviously, the prosecution did not persuade the judge, beyond a reasonable doubt, that Mrs. J.'s testimony about the alleged abuse was truthful. In acquitting Dr. Anderson, the judge noted, correctly, that Mrs. J.'s account was uncorroborated.

There were additional reasons to question some of Mrs. J.'s testimony. Mrs. J. gave conflicting (and arguably sometimes not very believable) accounts of numerous aspects of the case,[26] including the nature of the alleged abuse,[27] the circumstances under which the abuse took place,[28] and her condition at the time of Dr. Brown's January 2, 1997 visit.[29] Mrs. J. also gave testimony which dovetailed in some measure with her admitted hallucinations.[30]

Notwithstanding the foregoing, an impartial jury, acting reasonably, might perhaps credit a witness who gave this testimony, especially since the defendants took such pains to attempt to cover up the incident. It is not impossible that Mrs. J. was sexually abused by Dr. Anderson and that she nevertheless could not remember whether she was seated or standing at the time. One might conceivably conclude that Mrs. J.'s stated fears for her life and safety were neither fabricated nor irrational. In our view, however, an impartial trier of fact might well have problems with Mrs. J.'s testimony, as indeed the trial judge evidently did. Guilt, after all, must be proved beyond a reasonable doubt. Given the closeness of the case, and the centrality of the issue of Mrs. J.'s credibility, we conclude that the remedial steps taken did not stem the prejudice generated by the disputed evidentiary ruling and by the improper prosecutorial arguments. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Powell, supra,* 455 A.2d at 411. The obstruction of justice convictions therefore cannot stand.[31]

26. Mrs. J. did not really deny that she was inconsistent. In fact, the following exchange took place during her cross-examination by Dr. Anderson's attorney:

Q. Well, but over time your story has changed, has it not, ma'am?
A. Yes, it has.

27. Mrs. J. did not mention either to the male detective or to the female prosecutor that Dr. Anderson had placed her hand on his penis and had discharged semen on her. It appears that the first written reference to these events may have been in the complaint in Mrs. J.'s civil action for damages, which she brought against Dr. Anderson in August 1997.

28. Mrs. J. told the grand jury that the abuse occurred while she was sitting on a love seat. At trial, she stated that Dr. Anderson reached for her from behind as she "stood there."

Before the grand jury, Mrs. J. stated that her appointment was for noon, and that she was at Dr. Anderson's office until about 6:00 p.m., when it was getting dark. She did not recall telling the police, however, that she left at 3:00 p.m.

29. Mrs. J. told the grand jury that on that occasion she was "completely drugged" and "out of it." At trial, she denied any impairment and insisted that she could "remember that whole ordeal."

30. Mrs. J. suggested, for example, that someone might pay a "pipe head" five dollars to do away with her; that she was "hiding out" to avoid being "killed by some people[ ] just because ... they don't want me to testify"; and that "I'm not taking chances. I'm getting paranoid now."

31. Unfortunately, the counts of the indictment charging the defendants with obstruction of justice were drafted to conform to the language of the prior statute, which had been superseded in 1993. The pre–1993 version of D.C.Code § 22–722(a)(1), which government counsel evidently believed to be in force in 1997, did not contain an explicit requirement that the defendant act with the intent to prevent or interfere with "truthful" testimony. *Id.* (1989). The defendants therefore argue that the indictment should be dismissed because the grand jury never found probable

### D. *Criminal contempt of court.*

 Dr. Anderson was convicted of criminal contempt because, on January 14, 1997, he disobeyed the order, issued as a condition of his release in the original misdemeanor case, directing him to stay away from Mrs. J. Dr. Anderson's attorney has made no separate reference to the criminal contempt count either in his closing argument to the jury or in his submissions to this court on appeal. For all practical purposes, counsel has conceded the issue.

The relevant statute provides that as a condition of pretrial release of a defendant charged with a criminal offense, the court may, *inter alia,* order the defendant to "[a]void all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense." D.C.Code § 23–1321(c)(1)(B)(v) (1996). "A person who has been conditionally released pursuant to section 23–1321 and who has violated a condition of release shall be subject to revocation of release, an order of detention, *and prosecution for contempt of court.*" D.C.Code § 23–1329(a) (Supp. 2000) (emphasis added). "Contempt sanctions may be imposed if, upon a hearing and in accordance with principles applicable to proceedings for criminal contempt, it is established that such person has intentionally violated a condition of his release." D.C.Code § 23–1329(c). "The plain words of § 23–1329 authorize the use of contempt sanctions simply upon proof that a person has intentionally violated a condition of his

release." *Grant v. United States,* 734 A.2d 174, 177 (D.C.1999) (citation, footnote, and internal quotation marks omitted). It is not necessary for the government to prove that the defendant's conduct "interfered with the orderly administration of justice." *Id.*[32]

In the present case, it is undisputed that the trial court had issued a valid stay-away order. There can likewise be no doubt that for a significant period of time on January 14, 1997, notwithstanding the issuance of the stay-away order, Dr. Anderson was in the presence of Mrs. J., who was both an alleged victim of the crime with which Dr. Anderson had been charged and a potential witness against him. Although the various witnesses to the meeting in Dr. Brown's office described details of the event differently, all of them agreed that Dr. Anderson spoke with Mrs. J. and offered to pray with her—an offer which she most emphatically rejected. Obviously, even by his own account, Dr. Anderson did not "stay away" from Mrs. J.[33] Moreover, the intent element of § 23–1329(c) was plainly satisfied, for this offense "only requires proof that the appellant intended to commit the actions constituting contempt." *Grant, supra,* 734 A.2d at 177 n. 6. It cannot be disputed that Dr. Anderson intended to speak to Mrs. J., and thus to remain in her presence, when he asked her to pray with him.

cause as to an element of the post–1993 statute, namely, that Mrs. J.'s testimony was truthful. *Cf.* note 14, *supra.* But by indicting Dr. Anderson for sexual abuse, the grand jury effectively found probable cause to believe that Mrs. J.'s testimony regarding the December 3, 1996 incident was truthful. Moreover, by including the obstruction of justice counts in the indictment, the grand jury found that the defendants acted in a corrupt manner—a requirement of the current § 22–722(a)(2) and of its pre–1993 predecessor. Accordingly, the defendants are not entitled to dismissal of the indictment. *Compare* D.C.Code § 22–722(a)(1) (1989) *with* D.C.Code § 22–722(a)(2) (1996).

**32.** Arguably, "the statutory authorization of contempt sanctions for an intentional violation of a condition of pretrial release represents a legislative finding that such conduct is a *per se* interference with the orderly administration of justice." *Grant, supra,* 734 A.2d at 177 n. 5.

**33.** Dr. Anderson testified that when he came to Dr. Brown's office, he did not expect to be in the same room with Mrs. J. Even if one were to accept this testimony, which is at odds even with Dr. Brown's account, there is no doubt that Dr. Anderson *remained* in Mrs. J.'s presence after he and she found themselves in the same room and that he deliberately engaged her in conversation.

The foregoing discussion demonstrates that, for all practical purposes, Dr. Anderson had no legal defense to the criminal contempt charge. This count differs significantly from the obstruction of justice counts, for Dr. Anderson could properly be convicted of criminal contempt even if nobody believed a word of Mrs. J.'s account of alleged sexual abuse. Because the facts satisfying each element of criminal contempt are undisputed, Mrs. J.'s credibility or lack thereof had little or no relationship to Dr. Anderson's guilt or innocence of that offense. The prosecutor's misstatement of the law at the beginning of her rebuttal argument was significant as to obstruction of justice, but it had no bearing on the contempt count. Under these circumstances, we perceive no basis for interfering with Dr. Anderson's conviction of criminal contempt.

## III.

### CONCLUSION

Each defendant's conviction of obstruction of justice is reversed. Dr. Anderson's conviction of criminal contempt is affirmed. The case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*