Rocky L. BROWN, Appellant,

v.

UNITED STATES, Appellee.

No. 94–CF–1506.

District of Columbia Court of Appeals.

Argued May 22, 1996.
Decided Aug. 22, 1996.

Claudia Crichlow, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Gina Simms, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Halsey B. Frank, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and BELSON, Senior Judge.

SCHWELB, Associate Judge:

Rocky L. Brown was convicted by a jury of armed robbery [1] and of possession of a firearm during a crime of violence (PFCV). [2] On appeal, he contends that the trial judge unreasonably restricted his cross-examination of the complaining witness. We agree and remand for further proceedings.

## I.

## THE TRIAL

### A. The Evidence.

The government's chief witness at trial was the complainant, Mario Barber, who recounted a Valentine's night of terror redeemed by heroism. Barber, a former salesman for a software company, testified that on February 14, 1994, he was planning to spend the late evening with his girlfriend, Reagan Camille Rucker. Ms. Rucker called him at home at 11:00 p.m. and invited him to her house. Barber called a taxi. When the cab did not arrive, he decided to take a bus, and he walked to a bus stop on Georgia Avenue, N.W. While he was waiting for the bus, Barber called Ms. Rucker from a nearby telephone booth to explain the delay.

As Barber was talking to Rucker on the phone, he was approached by two menacing strangers. One of the men, whom Barber identified in court as the defendant, Rocky Brown, [3] barked at Barber: "Look, Slim, I'm going to tell you just like this, I want your coat and I want your wallet." The assailant repeated his demand and displayed a sawed-off shotgun. The other man, whose complexion was darker than Brown's, told Barber to

---

1. D.C.Code §§ 22–2901, –3202 (1996). All references in this opinion to the District of Columbia Code are to the 1996 replacement volume, unless otherwise expressly noted.

2. D.C.Code § 22–3204(b). The judge directed a verdict in Brown's favor on a charge of armed mayhem, id. §§ 22–506, –3202, and the jury acquitted Brown of assault with a deadly weapon. Id. § 22–502. The jury was unable to reach a unanimous verdict with respect to a charge of

armed kidnapping, id. §§ 22–2101, –3202, and the trial judge declared a mistrial as to that count.

3. Barber testified that the area was illuminated by the street lights and by the snow on the ground, and that he therefore got a "very good look" at Brown. Barber stated that he was "very sure" that Brown was one of his assailants.

"give it up, give it up."[4] Barber related that he hung up the phone and gave his wallet and class ring to the unarmed assailant.

Brown ordered Barber "to break," and Barber began to run away from the robbers. Before Barber was able to escape, however, Brown called him back and ordered him to go behind a nearby library. There, the gunman instructed Barber to give the darker man his jacket and shirt.[5] The other man then asked Barber whether he had any credit cards. Barber replied in the negative, but offered to give the men his two ATM cards. He told the robbers: "You're welcome to the money I have in my account.... I have $450 in one account [and] $700 and something in another account." Brown asked Barber for his ATM code, but Barber claimed that he did not know the numbers and that he could not provide them without looking at the keypad on the ATM machine. Barber testified that he stalled in this manner because he "wanted to make sure that [he] ... wasn't going to be ... shot and left there."

According to Barber, the robbers then decided to take him to an ATM machine so that they could help themselves to his money. They returned Barber's coat and escorted him to a burgundy Toyota Corolla which was located near the library. A third man was sitting in the car. Brown directed the man who was holding Barber's belongings to drive. Barber was ordered to sit in the rear passenger seat and to place his hands around the headrest. Brown then instructed the third man, who was sitting in the front passenger seat, to hold Barber's hands. Brown sat behind the driver and held the shotgun against Barber's ribs.

Barber first directed the driver to an ATM machine at the intersection of Georgia Avenue and Park Road, N.W. As the car approached the bank, however, he observed that the area was deserted. Barber testified that he then told the robbers that this partic-

ular ATM machine would not accept his card. He asked the driver to continue to another bank which was located near Howard University, an area in which Barber secretly hoped that there would be more people.

As the car pulled up at the second ATM machine at Girard Street, N.W., Brown reached between the two front seats for a piece of paper on which Barber could write down his ATM code. Barber testified that, at this point, he made a daring bid to foil his assailants. When Brown removed his right hand from the shotgun, Barber grabbed the barrel of the weapon with his left hand and pushed it away from his side. Brown threatened "to kill [Barber's] mother-fucking ass" and proceeded to shoot Barber in the right foot. As the shotgun discharged, the two men in the front seat jumped out of the car and ran out into the night. Barber claimed that he then struck Brown "a couple of times," and that Brown dropped the weapon and fled. The unarmed victim, according to his own account, had outwitted, disarmed, and routed the three robbers.

Barber exited the car, his foot bleeding, and asked a stranger to call the police. He placed the shotgun in the middle of the street and lay down on top of it until the police arrived. On the following day, Barber was shown a photo array and immediately identified Brown as the gunman.

Officer Ridley Durham of the Metropolitan Police Department (MPD) testified that he arrived at the crime scene at approximately 12:45 a.m. on February 15, 1994. He stated that he found a sawed-off shotgun in the street and a burgundy Toyota Corolla backed into a fire hydrant.[6] He recovered two live shotgun shells and one spent shell from behind the two front seats of the Corolla. From the rear passenger seat, Officer Durham retrieved a 1994 pocket calendar with Brown's birth certificate inside. Barber's wallet, which contained his credit cards, mon-

---

4. Ms. Rucker testified at trial that she heard an unknown voice say "give it up, give it up," and then Barber hung up.

5. Barber initially testified that he gave his watch to the robbers, along with his wallet and class ring. Later in his testimony, however, Barber stated that he attempted to conceal the watch, but that it was taken from him after he removed his shirt.

6. The record does not disclose the identity of the owner of the car.

ey, and ATM cards, was also recovered from the scene. Officer Durham did not find any powder burns or holes in the carpet of the car, but he observed black residue, which was similar to a powder burn, on Barber's trousers.

Officer Benjamin Mazyck, a fingerprint specialist, testified that he was able to lift only one usable fingerprint from the shotgun, and that the print did not match either Brown's or Barber's fingerprints. Mazyck therefore concluded that someone other than Barber or Brown had touched the shotgun. Mazyck explained, however, that the failure to recover Brown's or Barber's fingerprints from the shotgun did not mean that these men did not also handle the weapon.

Brown did not testify. None of his witnesses, who included three police officers and a defense investigator, had personal knowledge of the alleged robbery, and their testimony is not relevant to the principal issue on appeal.

### B. Barber's Cross–Examination.

Brown's attorney questioned Barber extensively about his alleged motive to curry favor with the government. Barber had been accused of defrauding his former employer of at least five thousand dollars. On cross-examination, Barber admitted that, while he was employed as a salesman, he allowed several individuals to buy merchandise by using credit cards which he knew "[were not] really their credit card[s]." In exchange, Barber received cash, sportswear, and other merchandise. According to Barber, one of his supervisors "got [him] into doing it," but Barber acknowledged that he continued his fraudulent activities after the supervisor left the company. The scheme was perpetrated on a daily basis from late January 1994 until early May 1994, when Barber was confronted by a store investigator and his employment was terminated.

The allegations against Barber were still being investigated at the time of trial. When the prosecutor asked Barber whether he hoped or expected to benefit from his cooperation in the ongoing investigation, Barber stated:

> The only thing that I'm hoping for is the fact that I don't have a record. I've never been locked up or never been prosecuted for anything, so that ... the only thing that I'm hoping that I can have on my side is the fact that I do have a clean record. This is a one-time thing.

The defense attempted to discredit Barber by suggesting on cross-examination that he had cooperated in the fraud investigation and in the present case in order to avoid prosecution, but Barber insisted that this was not so:

> No, I want to repay the debt that I owed [the company] and deal with what I done. That's what I want to do. There's no way—there's no way back. I already made a choice.

> \*   \*   \*   \*   \*   \*

> I would love to [avoid prosecution], but the way things are going, I'm going to have to stand accountable for my actions.

Barber was also cross-examined about various inconsistencies in his statements to police. The defense brought out, for example, that Barber had told the police, immediately after the robbery, that the man who shot him was light-skinned. In fact, Brown's skin is a darker shade of brown.

In addition, defense counsel attempted to show, through cross-examination, that portions of Barber's account of the robbery were incredible in a number of respects. Counsel questioned, for example, the plausibility of Barber's claim that he had convinced his apparently credulous assailants that he did not know his own ATM code, and that the first ATM machine would not accept his card. Brown's attorney also sought to cast doubt as to the truth of Barber's account of his own resourcefulness and bravery in confronting and foiling three robbers, one of whom had kept a sawed-off shotgun stuck in Barber's ribs.

### C. The Issue of Barber's Alleged Drug Use.

Brown's attorney represented to the court, *ex parte*, that Barber had a motive to fabricate his account of the alleged robbery in order to conceal the fact that he was himself engaged in illicit activities on February 14, 1994. Specifically, counsel claimed that he

was entitled to cross-examine Barber about Barber's abuse of drugs:

Basically what I'm going to seek to show on cross-examination of Mr. Barber is that what he was really doing on the night of this incident was looking to buy drugs and that [the reason] that he was defrauding his company ... was to help support his drug habit.

When the trial judge asked counsel whether he had a "good faith basis" to inquire into Barber's alleged drug use, counsel proffered that

I have information from sources, people who know him, and people who know him have told me that.

*    *    *    *    *    *

People who have met Mr. Barber, people who have seen him out at parties and things like that.

The judge responded as follows:

So do you have a basis to proffer to the court that on the day of this robbery, [Barber] was under the influence of drugs, which I think might be relevant to the issue of his ability to observe? ... That's a different issue, that's the only thing I would allow. I think it's prejudicial and not particularly probative, and my earlier ruling stands even in light of your *ex parte* proffer.... It does not bear directly [on] the issue at trial here, which is whether your client robbed him.

*    *    *    *    *    *

You will be allowed to ask about alleged drug abuse, provided you have a good faith basis for believing that at the time of the robbery this complainant was under the influence of drugs. If you do not have that good faith basis, ... I'm ruling it's not admissible.

Counsel reiterated that he had "a good faith basis to believe that [Barber] was looking for drugs on that evening." When the judge asked why that was relevant, counsel explained:

The relevance, Your Honor, is that my whole theory of this case, my whole opening statement, is [that] [Mr. Barber is] not telling the truth about what he did. The jury's going to know that because I'm going to impeach him about a half dozen times ... with prior inconsistent statements and also the fact that he was supporting a drug habit and that he was looking to buy drugs that night and that's why he was with these people and that's how he got shot.

The following colloquy then occurred:

COURT: Before you cross-examine him on any reference to the subject of drugs, please provide me [with] a case that says it is permissible to cross-examine him about drugs when you have no reason to believe, based on your proffer, that at the time of the robbery he was under the influence of drugs. I'd like to see a case that says it's proper examination.

*    *    *    *    *    *

I'd like you to provide me with some authority on the second proffer, which is that he was looking for drugs. I think that is again prejudicial and I think I'd like to see a case that says you can do that.

COUNSEL: I'm going to look for one, Your Honor, but ... it's one of the most common defenses in this courthouse, especially in sex cases, but often robbery cases, but especially in sex cases where it's a rape or sodomy, that what actually was going on was a consensual act whereby there was some agreement to pay and it broke down, the person didn't pay and there was an argument, fight or whatever, and then the police end up being called and it was called a rape instead of the person saying what really happened according to the defense, which is that this was a consensual act and it was a prostitution. That's one of the most common defenses in the courthouse.

COURT: I'll review my cases, too. I just know that the Court of Appeals has recognized that it's a very sensitive area and there has to be some predicate met in my mind before allowing it, but I will review them also.

As far as the record discloses, counsel did not provide the judge with any authority to support his proposed cross-examination.

The defense asked the judge to instruct the jury with respect to the defense theory of the case, as follows:

> The defense in this case is that Mario Barber is not telling the truth because he wanted to direct attention away from his own actions.

With some reluctance, the judge charged the jury as requested, noting that she was obliged so to instruct "if there is any evidence fairly tending to bear upon the issue, however weak." *See* Criminal Jury Instructions for the District of Columbia, No. 5.01 (4th ed. 1993) (quoting *Rhodes v. United States,* 354 A.2d 863, 864 (D.C.1976)).

The jury convicted Brown of armed robbery and of PFCV. This appeal followed.

## II.

## LEGAL DISCUSSION

*A. The Legal Principles.*

■ "The guaranteed opportunity to cross-examine adverse witnesses is an inherent component of the defendant's Sixth Amendment right of confrontation." *Scull v. United States,* 564 A.2d 1161, 1164 (D.C. 1989). "An important function of this constitutionally-protected right is the exposure of the witness' biases or motives for not telling the truth." *Elliott v. United States,* 633 A.2d 27, 32 (D.C.1993).[7] "[C]ross-examination serves as a vehicle to uncover possible biases, prejudices, or ulterior motives of the witness as they relate to issues or personalities in the case at hand." *Jenkins v. United States,* 617 A.2d 529, 531 (D.C.1992) (citations and internal quotation marks omitted).

■ This court has recognized that "bias is always a proper subject of cross-examination." *Jones v. United States,* 516 A.2d 513, 517 (D.C.1986) (citations and internal quotation marks omitted). Indeed,

> the refusal to allow *any* questioning about facts indicative of bias from which the jury could reasonably draw adverse inferences of reliability is an error of constitutional

dimension, violating the defendant's rights secured by the Confrontation Clause.

*Ford, supra* note 7, 549 A.2d at 1126 (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 678–79, 106 S.Ct. 1431, 1434–35, 89 L.Ed.2d 674 (1986)). "Moreover, cross-examination seeking to ferret out bias takes on enhanced significance where the credibility of the key government witness is in issue." *Jenkins, supra,* 617 A.2d at 531.

■ On the other hand, the right to cross-examination "is subject to reasonable limits imposed at the discretion of the trial judge," *Scull, supra,* 564 A.2d at 1164, and "[the] extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." *Jones, supra,* 516 A.2d at 517 (quoting *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931)) (alterations in original). This court has acknowledged, in particular, "the discretionary role of the trial court in controlling bias cross-examination." *Ford, supra,* 549 A.2d at 1127.

> In exercising its discretion, the trial court may restrict cross-examination within reasonable limits to avoid such problems as harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.... The court may also exercise its discretion to preclude cross-examination where the prejudicial effect of the proffered evidence outweighs its probative value.

*Elliott, supra,* 633 A.2d at 32 (citations and internal quotation marks omitted).

■ In addition, "a proper foundation must be laid before a cross-examiner may pursue a line of questioning suggesting that a witness is biased." *Ray v. United States,* 620 A.2d 860, 862 (D.C.1993); *see also Scull, supra,* 564 A.2d at 1164 ("we are loath to allow cross-examination without the establishment of a proper factual foundation").

Thus, to survive objection, the questioner must proffer some facts which support a genuine belief that the witness is biased in

---

7. "Bias" refers both to a witness' "personal bias for or against a party" and to his or her "motive to lie." *See Ford v. United States,* 549 A.2d 1124, 1125 n. 2 (D.C.1988). In the present case, the issues presented relate to Barber's alleged motive to lie.

the manner asserted.... In addition, the attorney must proffer facts sufficient to permit the trial judge to evaluate whether the proposed question is probative of bias. *Jones, supra,* 516 A.2d at 517 (citations and internal quotation marks omitted); *accord, Scull, supra,* 564 A.2d at 1164 (quoting *Jones*). "In the absence of such a factual foundation, the questioner must articulate a 'well reasoned suspicion' rather than 'an improbable flight of fancy' to support the proposed cross-examination." *Scull, supra,* 564 A.2d at 1164 (footnote and citations omitted).

■ "[C]ase law in the District of Columbia is fairly lenient in describing how th[e] requirement [of a factual foundation] may be met." *Carter v. United States,* 614 A.2d 913, 919 (D.C.1992). This court has explained the foundational requirement as follows:

> [T]he questioner must support any proposal for cross-examination with a credible statement describing the suspected cause of bias in the witness, supported by plausible factual allegations or itself plausible within the framework of facts that neither party has contested.

*Scull, supra,* 564 A.2d at 1164 n. 4. A defendant's proffer is sufficient, for example, if "counsel has information from her own client, which she does not know to be false and which is not inherently incredible." *Id.* at 1164 (citation and internal quotation marks omitted). After all, "a proffer is nothing more than an offer to prove factual allegations, and does not consist of their proof itself." *Id.* at 1164 n. 4. Indeed, "an important purpose of cross-examination is exploration, and the trial court must give counsel some leeway to probe for information that she cannot prove before commencing cross-examination." *Id.* at 1165 n. 6.

■ Nevertheless, the proposition that "the Sixth Amendment permits skeptical questioning aimed at probing for the truth, notwithstanding the lack of a good-faith basis

for an accusation of bias; has no support in the law." *Ray, supra,* 620 A.2d at 863 (footnote and internal quotation marks omitted). For that reason, a trial court does not abuse its discretion by precluding cross-examination where "[t]he connection between the facts cited by defense counsel and the proposed line of questioning [is] too speculative to support the questions." *Id.; see also Elliott, supra,* 633 A.2d at 34 (proffer inadequate because the suggested cause of bias was "speculative at best"); *Jones, supra,* 516 A.2d at 517–18 (proffer inadequate because counsel failed to explain the nature of the witness' alleged bias).

### B. The Principles Applied.

Brown contends that the judge abused her discretion by prohibiting all inquiry about whether Barber was trying to buy drugs on the night of the alleged robbery, when such inquiry was probative of Barber's motive to lie and "was aimed at exposing the truth about the incident." Brown's theory was that Barber was shot in connection with his attempt to purchase drugs, and that Barber fabricated his account of the robbery in order to cover up his own illegal conduct.[8]

The judge ruled that Brown would be permitted to cross-examine Barber on the subject of drugs only if counsel had "a good faith basis for believing that at the time of the robbery [Barber] was under the influence of drugs." The judge was appropriately concerned about the potential prejudice associated with questioning Barber about his alleged drug use. "[G]iven the highly inflammatory nature of an allegation that a witness is a drug user, drug usage other than at the time of the incident testified about is generally not a proper subject of cross-examination." *Ford, supra,* 549 A.2d at 1126 (quoting *Rogers v. United States,* 419 A.2d 977, 981 (D.C. 1980)) (internal quotation marks omitted).

---

8. Brown's theory of the case is somewhat unusual in that it is not affirmatively exculpatory. Brown proffered no explanation of what transpired that Valentine's night, or of his own role in the incident. He did not claim misidentification, nor would such a defense have been likely to succeed (even in the absence of Brown's fingerprints on the shotgun) where Barber promptly identified Brown as one of the robbers and where Brown's birth certificate was recovered from the abandoned car. Moreover, Brown's theory—that Barber was shot during the course of a drug deal—would not necessarily negate the possibility that Barber was nevertheless a victim of armed robbery and that Brown was one of the robbers.

■ Cross-examination regarding a witness' alleged drug abuse is permissible in order to show the effect of drugs on the witness' ability to observe at the time of the incident, but that is not the only issue to which the subject is relevant. On the contrary, this court has explicitly recognized that such cross-examination is permissible to demonstrate the witness' motive to lie, so long as the defendant is able to establish a proper foundation for the proposed line of inquiry.

In *Ford, supra,* for example, a government witness, who was also the defendant's cousin, testified that the defendant had stabbed him while the witness was sleeping in his bed. 549 A.2d at 1124–25. The defendant sought to establish, through cross-examination, that the witness had implicated him in the stabbing because the witness was afraid to name the actual assailants. According to the defendant's extensive proffer, the witness was a drug dealer who had been threatened repeatedly by individuals to whom he owed drug-related debts. *Id.* at 1125 & n. 3. As in this case, the trial judge permitted counsel to question the witness only about the influence of drugs, if any, on his ability to observe at the time of the stabbing, and sustained the prosecution's objections to any other inquiry about the witness' narcotic activities. *Id.* at 1126.

■ Ford was convicted, but this court reversed his conviction. We held that the trial judge had "prohibited *all* inquiry into the possibility of a motive for bias," and that this wholesale proscription "violated [the defendant's] rights secured by the Confrontation Clause." *Id.* at 1127 (quoting *Van*

*Arsdall, supra,* 475 U.S. at 679, 106 S.Ct. at 1435) (internal quotation marks omitted) (emphasis in original); *see also Scull, supra,* 564 A.2d at 1163–67 (trial court committed reversible error by denying defendant's motion to cross-examine government witnesses about their prior sales of marijuana); *cf. Elliott, supra,* 633 A.2d at 31–34 (trial court properly excluded cross-examination about whether co-defendant supplied witness with drugs because defense counsel failed to lay adequate foundation); *Jones, supra,* 516 A.2d at 516–18 (trial court correctly prohibited inquiry into witness' prior sale of marijuana to defendant where "proffer was insufficient to permit the trial judge to evaluate whether the proposed line of questioning was probative of bias").[9]

■ The extent of cross-examination with respect to a witness' motive to lie is confided to the trial judge's sound discretion. *See Ford, supra,* 549 A.2d at 1127. "Judicial discretion must, however, be founded upon correct legal principles, . . . and a trial court abuses its discretion when it rests its conclusions on incorrect legal standards." *In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991) (citations omitted). In the present case, we conclude in light of *Ford* that the judge erred in applying an unduly restrictive legal standard which undermined her exercise of discretion.

■ Significantly, the government does not attempt to defend the legal basis of the judge's ruling. Instead, the government argues that the judge did not abuse her discretion because defense counsel failed to lay a sufficient foundation for the proposed cross-examination. The government points out

9. In the present case, the judge repeatedly asked Brown's attorney to provide her with authority to support his proposed line of cross-examination, but counsel did not bring *Ford,* or any other pertinent case, to her attention. In some measure, the defense thus contributed to the error of which it now complains. Notwithstanding his failure to cite the relevant precedents to the trial judge, however, Brown's attorney fairly apprised her of his basic claim. We therefore conclude— and the government apparently does not dispute—that counsel adequately preserved his objection to the judge's ruling, and that the propriety of that ruling is therefore properly before us. *See Foote v. United States,* 670 A.2d 366, 371 n. 14 (D.C.1996).

Although Brown's claim technically has been preserved, the phrase "abuse of discretion" seems somewhat unfair when applied to a conscientious trial judge who invited the defense to provide authority and who received no assistance on a very difficult issue. We can only reiterate that "abuse of discretion is a phrase which sounds worse than it really is. . . . The term does not imply . . . any reflection on the judge." *King v. United States,* 550 A.2d 348, 353 n. 3 (D.C. 1988) (quoting *United States v. Walker,* 772 F.2d 1172, 1176 n. 9 (5th Cir.1985)) (alterations in original).

that, when the judge asked counsel to identify the "sources" from whom he had learned about Barber's drug abuse, he responded rather vaguely that his informants were "people who have met Mr. Barber, people who have seen him out at parties and things like that." The government contends that this proffer was insufficient. Brown argues that Barber's fraudulent conduct and his activities on Valentine's night were also consistent with drug use, but we are inclined to agree with the government that, even if this is so, the proffer as a whole was not overwhelming.

The colloquy between the judge and Brown's attorney never focused, however, on whether counsel had proffered sufficient facts to support "a genuine belief" that the witness had a motive to lie. *Scull, supra,* 564 A.2d at 1164. Immediately after counsel made his proffer, the judge made her initial ruling that "the only thing [she] would allow" was cross-examination about whether Barber was under the influence of drugs at the time of the alleged robbery. That ruling was not based on counsel's lack of specificity, but rather on the judge's belief that the proposed line of questioning was improper as a matter of law. *Compare Elliott, supra,* 633 A.2d at 31 (trial judge properly prohibited cross-examination on ground that "the proffered evidence of the alleged criminal relationship [between the witness and the co-defendant] was too tenuous"). Even if Brown's attorney had named his "sources" and provided a

more detailed account of their statements to him, the judge's understanding of the controlling law would have compelled her to make the same ruling. Moreover, in light of the judge's perception of this court's jurisprudence, there was no incentive or occasion for Brown's attorney to elaborate further on his proffer.

Counsel focused, appropriately, on persuading the judge that his proposed line of questioning was probative. When he failed to convince her that this was so, the sufficiency of the defense proffer became academic. It would therefore be unfair to affirm Brown's conviction on the ground that the defense failed to lay an adequate foundation for its proposed line of cross-examination.

## C. The Remedy.[10]

We likewise conclude, however, that the defense proffer was not so clearly developed that reversal of the conviction is warranted without further proceedings on remand. Whether the defendant has established an adequate foundation for a proposed line of cross-examination is a discretionary determination to be made, in the first instance, by the trial judge. *See Elliott, supra,* 633 A.2d at 34 (finding "no abuse of discretion in the trial court's ruling that the foundation was inadequate to allow the cross-examination"). Because the judge precluded cross-examination of Barber about his alleged drug use on a different ground, she

---

**10.** The government contends that, even if the trial judge's ruling was erroneous, any error was harmless. We disagree.

Because the improper restriction of an entire line of cross-examination regarding a witness' motive to lie is an error of constitutional dimension, we apply the standard for constitutional harmless error enunciated by the Supreme Court in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *See Ford, supra,* 549 A.2d at 1126–27. Under the constitutional standard,

it must be clear beyond a reasonable doubt (1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony.

*Scull, supra,* 564 A.2d at 1166 (citations and internal quotation marks omitted).

The government obviously has not established beyond a reasonable doubt that Brown would

have been convicted without Barber's testimony. On the contrary, Barber was the prosecution's chief witness, and his testimony was decisive to the government's case.

The second part of our harmless error test presents a closer question, but we conclude that the error was not harmless under that standard either. If cross-examination based on Barber's alleged drug use had been permitted, Barber's credibility might have been further impaired. Although Barber was substantially impeached on the basis of his fraudulent conduct vis-a-vis his employer, and although parts of his account of the events of Valentine's night were arguably quite improbable, a showing that he abused drugs and was trying to buy them on the night in question might well have reinforced the impeachment by bringing all of Barber's dishonest activities under a single rubric—lying and cheating to feed a drug habit—and by thus providing a plausible explanation of Barber's motive to lie.

had no occasion to rule on the sufficiency of Brown's proffer.

The judge did not consider, for example, whether Brown had proffered " 'facts which support[ed] a genuine belief' that the witness [was] biased in the manner asserted," or alternatively, whether Brown had "articulate[d] a 'well reasoned suspicion' rather than 'an improbable flight of fancy' to support the proposed cross-examination." *Scull, supra,* 564 A.2d at 1164 (citations and footnote omitted). She likewise did not weigh the probative value of the proffered evidence, properly understood, against the obvious prejudicial effect of any exploration of Barber's drug use.

On this record, the determination whether Brown's proffer in the trial court was adequate under our case law, and whether its probative value was sufficient to offset its prejudicial effect, should not be made in the first instance by an appellate court. Rather, we think the proper remedy under these circumstances is to remand the case so that the trial judge may exercise her discretion in this regard. A remand is particularly appropriate because, from defense counsel's perspective, the judge's misperception of the law obviated any incentive for counsel to make a more comprehensive proffer in the trial court. Upon remand, defense counsel will have an opportunity to do so.

If Brown proffers sufficient facts on remand to support a "genuine belief" or a "well-reasoned suspicion," *id.,* that Barber's alleged drug abuse provided a motive to lie, and if the judge concludes that the prejudicial effect of the proposed evidence does not substantially outweigh its probative value,[11] then Brown's conviction must be set aside and a new trial ordered. If, on the other hand, Brown's proffer does not meet this standard, then his conviction must stand.

### III.

### CONCLUSION

For the foregoing reasons, the case is remanded to the trial court for further proceedings consistent with this opinion.

■ *So ordered.*[12]

■

11. In weighing probative value against prejudicial effect, the trial judge may obviously consider the fact that a strong proffer is potentially more probative than a weak one.

12. On the second day of deliberations, the court received from the jury the following note:

> One, to carry its burden on count one, does the government have to prove that this defendant was holding the gun or is it sufficient for the government to prove that one of the three alleged perpetrators was holding the gun and it was used by any one of them to commit the robbery in which this defendant participated? Two, same question for count two.

Relying on *Bouknight v. United States,* 641 A.2d 857 (D.C.1994), the judge instructed the jury with respect to aiding and abetting, and allowed both parties to make supplemental closing arguments. Brown contends that the aiding and abetting instruction was not warranted. We disagree.

"[Alt]hough the government's original theory of the case was that [Brown] was a principal in the commission of the crime, ... there [was] clear and convincing evidence that [Brown] was present and participating in the crime." *Id.* at 860. Another person's fingerprints were on the shotgun, and that person was a possible principal. *Brooks v. United States,* 599 A.2d 1094 (D.C.1991), is therefore distinguishable. In *Brooks,* there was no evidence tending to show "that someone other than [the] defendant was the principal whom the defendant aided and abetted." *Id.* at 1099 (citations and internal quotation marks omitted).