Reginald D. BENNETT, Appellant,

v.

UNITED STATES, Appellee.

No. 00–CF–1653.

District of Columbia Court of Appeals.

Argued June 12, 2003.

Decided June 2, 2005.

Richard K. Gilbert, Washington, DC, appointed by the court, for appellant.

Valinda Jones, Assistant United States Attorney, with whom Roscoe C. Howard, United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, Thomas A. Dibiase, and Elizabeth C. Coombe, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, FARRELL and GLICKMAN, Associate Judges.

WAGNER, Chief Judge:

Following his second jury trial for first-degree murder (premeditated) while armed and related weapons offenses, appellant was found guilty only of the charges of possession of an unregistered firearm (PUF) (D.C.Code § 6–2311(a) (1997))[1] and unlawful possession of ammunition (UPA)[2] (D.C.Code § 6–2361(3) (1997))[3] (1997). In this appeal, appellant argues that the trial court's restriction of his cross-examination of a key government witness about the witness' mental health history, exclusion of the testimony of his expert psychiatrist concerning its significance and preclusion of cross-examination of a witness with a prior inconsistent statement violated his Sixth Amendment rights to confrontation, compulsory process and to present a defense. He also challenges his convictions of PUF and UPA on the grounds that the statutes under which he was convicted are unconstitutional under the Second and Fifth Amendments. We hold that the trial court did not abuse its discretion in limiting evidence concerning

the witness' mental health and excluding expert psychiatric testimony, and that the error, if any, concerning the admission of the witness' prior inconsistent statement was harmless. Further, we reject under controlling precedents appellant's belated constitutional challenges to the PUF and UPA statutes.

## I.

### Factual Background

At trial the government sought to prove that appellant and a man named Jerome Lucas shot and killed Preston Pearson on April 17, 1997. The principal witnesses supporting the armed murder charge against appellant were Jerome Lucas and G.S. The government's theory was that appellant and Lucas shot Pearson as revenge for Pearson having shot Lucas on Christmas Eve in 1996.

Lucas testified pursuant to a plea agreement under which he entered a plea of guilty to second-degree murder. Lucas testified that in December 1996, he, appellant and one John Richardson planned to rob Pearson. Lucas said that he had a .357–caliber gun, Richardson had a Tech 9, and appellant had no gun, although he and Richardson obtained their guns from appellant.[4] Lucas testified that on the night of the planned robbery, Christmas Eve, he became separated from appellant and Richardson. He heard gunshots and then saw Pearson and three other people coming out of the alley. Lucas testified that

---

1. Recodified at D.C.Code § 7–2502.01(a) (2001).

2. Appellant's first trial on the charges ended in a mistrial after the jury was unable to reach a verdict on any of the counts. After the second trial, the jury found appellant not guilty of first-degree murder while armed (D.C.Code §§ 22–2401, –3202, –105) and car-

rying a pistol without a license (D.C.Code § 22–3204(a)).

3. Recodified at § D.C. 7–2506.01(3) (2001).

4. Lucas was impeached with his grand jury testimony in which he said that appellant had a gun, but he explained that he had been mistaken at the grand jury.

he turned around and started shooting, and he was shot in the leg, resulting in a permanent limp. He did not see who shot him, but appellant told him that it was Pearson. Lucas testified that he wanted to get revenge, and appellant said that he was "with it."

Lucas testified that, the night of the Pearson shooting, he, appellant and Richardson found out that Pearson was in the area of 15th and A Streets. According to Lucas, he obtained a gun from G.S.'s house, and appellant obtained a 9mm weapon from someone known as "T–Dog," while G.S. was close by. Lucas found Pearson riding a bicycle near 15th and A Streets, and he shot him three or four times. Lucas testified that Pearson fell from the bike, and appellant came out of the alley and shot Pearson six to eight more times. Lucas said that he ran down an alley where Richardson was waiting in a car, and he took off his outer clothing and hid his weapon. Lucas then walked out of the other end of the alley, and the police stopped him. Subsequently, Lucas gave a videotaped statement, which he characterized as "half true and half lies." Initially, Lucas denied knowing anything about Pearson's murder; later he said that John Littles shot Pearson. Lucas explained at trial that John was a fictitious name, and that he named Richardson because he thought that the police could not prove anything against him.

G.S. testified that during the spring of 1997, appellant, Lucas and a man named John frequented his home. He testified that during that period, he saw appellant with a gun stuck in his pants, and he heard Lucas and appellant talking about killing someone. G.S. stated that on the night that Pearson was killed, he went to an alley near 15th and A Streets to try to get some crack cocaine by assisting a drug dealer. While in the alley, he heard Lucas, appellant and John saying that they were "getting ready to take care of business, [g]etting ready to move on out" and "you go your way, I'll go mine." According to G.S., he saw appellant run past him with a gun in his hand. Subsequently, G.S. drew a picture of the gun he saw in appellant's possession.[5] G.S. testified that Lucas, who was holding what looked like a gun, ran in a different direction.

G.S. testified that after he obtained something from a drug dealer, he walked to the corner of 15th and A Streets where he saw Lucas and another man whom he concluded was appellant, running into the middle of the street toward a man on a bicycle. He said that he heard gun shots, but he did not see what happened next because he "hit the ground." G.S. was impeached with his grand jury testimony, in which he had said that he saw the two men "point guns at [a man on a bicycle] and gunfire let out." G.S. testified that after the shots were fired, he saw Lucas running away with a gun in his hand.[6]

According to G.S., not long after he arrived home, appellant came by looking for Richardson. Appellant explained that the man got shot because he had shot Lucas in the leg. G.S. also testified that he had left Richardson at his house with a female

5. A forensics expert testified that the drawing looked like a semi-automatic handgun.

6. Although G.S. corroborated most of Lucas' testimony, he contradicted Lucas' claim that Richardson was involved in the murder. G.S. testified that before he went to the alley where he heard Lucas, John and appellant talking about getting someone, Richardson and a

woman came to his apartment and asked to use a room. *Id.* at 81–82. After Richardson paid him, G.S. left Richardson and the woman in the apartment. *Id.* G.S. did not see Richardson again until after the shooting, when Richardson and the woman were walking away from G.S.'s house. *Id.* at 147.

companion before he went to 15th and A Streets.

G.S. admitted in testimony that he had received mental-health treatment, but he said that he was not on medication at that time. According to G.S., he was prescribed medication, including Cogentin and others, the names of which he could not recall, but he did not take the medication because it made him drowsy and dizzy. G.S. thought the medications were to make him relax. *Id.* He said that he had received disability payments, partly because of his mental illness and partly because of a physical handicap, poor eyesight. G.S. testified that although he was not taking his medication, he did not experience any symptoms of his mental illness in 1997, and did not hear voices or see things in April 1997 and the preceding months. G.S. admitted using crack cocaine around the time of the murder, but he said that he did not use the crack that he obtained that night because he was too shaken.

G.S. also testified pursuant to a plea agreement, and he admitted that he had been a paid informant in an unrelated matter. G.S. was impeached with a prior conviction for unlawful entry and escape. Before the grand jury, G.S. said that one of the guns he saw looked like "a pirate gun that shoots big balls" or a spaceman's gun and that appellant had a "big old .45 nickel-plated gun," which contradicted his trial testimony that appellant was armed with a 9mm handgun. G.S. also testified in the grand jury that John had a .38 Smith and Wesson handgun, contrary to his trial testimony that he did not recall John having a gun. G.S. attributed the inconsistencies in his testimony to poor memory and the passage of time. G.S.'s trial testimony to the effect that he had average eyesight with some trouble seeing out of his right

eye was impeached with his 1990 application for Social Security in which he claimed that he was eighty-five percent blind in his right eye and had poor vision in the left. G.S. explained that he had exaggerated his condition because he wanted the money.

The final witness who provided evidence related to appellant's PUF and UPA convictions was Emerson Ellis.[7] He also testified pursuant to an agreement with the government. However, he testified that he did not remember or could not recall in response to many of the prosecutor's questions. The government, using Ellis' grand jury testimony, brought out that he had testified before the grand jury that he had seen appellant, Lucas and Richardson together in the area of 17th and A Streets on the night of the murder, that appellant told Ellis that he had borrowed either a .380 or a 9mm handgun from "T-Dog," that appellant had come out of the alley and shot Pearson after Lucas shot him, and that appellant was known to carry a 9mm handgun.

Mr. Walter Dandridge, who was employed with the Bureau of Alcohol, Tobacco and Firearms as a firearms and toolmark examiner, testified that two different kinds of handguns, a Tokarov and a 9mm semi-automatic, were fired at the scene of the murder. The government also introduced evidence that appellant did not have a registration certificate for any kind of firearm or ammunition when the crimes were committed.

## II.

### A. *Restriction of Evidence on Witness' Mental Health*

Appellant argues that the trial court's ruling restricting his cross-examination of

7. Although other witnesses testified concerning issues related to the murder, they did not provide evidence related to the PUF and UPA counts on which appellant was convicted.

the government's witness, G.S., about his prior diagnosis of paranoid schizophrenia and excluding an expert witness' testimony about the general characteristics of that illness on G.S.'s credibility violated his rights under the Sixth Amendment. The government argues in response that the trial court did not abuse its discretion in so ruling because: (1) there was no evidence or showing that G.S. had active delusional symptoms near the time of the murder; (2) the diagnosis had minimal probative value; and (3) the evidence carried a high risk of prejudice. Further, the government contends, the proffered expert's speculation about the way in which paranoid schizophrenia might manifest itself was not sufficiently probative to overcome its prejudicial effect.

### (1) *Factual and Procedural Background Concerning Excluded Evidence*

#### (a) *Competency Hearing and Preliminary Rulings*

At the time of appellant's first trial, the trial court conducted a proceeding to determine G.S.'s competency to testify. G.S. testified that he was forty years of age, a graduate of a local high school, and a student for several years at Howard University and the University of the District of Columbia, from which he received a certificate in automobile repair training. G.S. provided information concerning his family relations, prior job, current and previous residences, and military service. He was able to name the then current President and the previous one. G.S. responded to questions that elicited that he understood the oath, the requirement for telling the truth, and the consequences for not telling the truth while under oath, including specifically being subject to a perjury charge and incarceration.

G.S. acknowledged that he started seeing a psychiatrist when he was twelve years old related to his father's death. G.S. said that in the 1980's, he was diagnosed with "dual personality," or "paranoid schizophrenia" when hospitalized at St. Elizabeths Hospital following losing his job. He explained that he was using "Love Boat," at that time, a drug that "make[s] you crazy." [8] According to G.S., he had been prescribed medication for his mental illness in April 1997, but he did not take it because in 1995 and 1996, he had experienced adverse side effects from it (*e.g.*, seizures, dizziness, impairment of speech and lack of body control). In April 1997, G.S. started going to D.C. General Hospital for treatment. However, he said that the only medication prescribed for him then was a form of penicillin for a pulled muscle.

After hearing G.S. testify, defense counsel acknowledged that G.S. did not "admit any psychosis today," and he said that he was not prepared to contest G.S.'s competency to testify at that time. Based upon the inquiry, the trial court concluded that "[G.S.] is clearly competent to recall, perceive and relate reported facts and testify truthfully in that he understands ... clearly his responsibility in terms of telling the truth[,] and he was ... quite forthcoming about his mental illness." The court observed that any factual inconsistencies or inaccuracies in his testimony appeared to be no different than any other witness, and that such testimony could be addressed as a credibility issue. The trial court found significant to its decision that G.S. did not appear to be suffering from any psychosis at that time, and "up-to-date" medical records, including an intake assessment completed within the previous sixty days indi-

---

8. "Love Boat" has been identified as a street name for PCP (phencyclidine)-laced marijua-

na. *See Poteat v. United States,* 559 A.2d 334, 335 (D.C. 1989).

cated that G.S. had no thought disorder. The court observed that the dual personality diagnosis, although of some concern, had been connected with PCP use, a factor which would not preclude G.S.'s testimony. Further, the court noted that there was "[no] record that [G.S.] had auditory hallucinations or delusions close in time to [the crime charged,] ... [o]r even relatively remote in time."

The trial court ruled that defense counsel should not use the label, "paranoid schizophrenic," in a way that would inflame the jury, although the court stated that the jury should know that G.S. was taking medication for a major mental illness. The court deferred ruling on whether psychiatric testimony could be presented until after G.S. testified. It also ruled that it would not order G.S. to undergo a psychiatric examination by a defense psychiatrist because the record did not show the rare circumstances warranting such an order over the witness' objection.[9] The court also declined defense counsel's suggestion to place before the jury a list of symptoms for paranoid schizophrenia from the "DSM4." Ultimately, G.S. did not testify at the first trial; however, the trial court reviewed the transcript of this proceeding in connection with subsequent rulings on the admissibility of the mental health evidence related to G.S.

### (b) *Motion in Limine Related to Mental Health Evidence*

Prior to appellant's second trial, the government filed under seal a "Motion *in Limine* to Preclude the Admission of [G.S.'s] Medical Records and to Limit Cross–Examination Regarding [G.S.'s]

Mental Health History and Drug Use." The motion stated that G.S., who was expected to be called by the government as an eyewitness, had been hospitalized six times for mental health reasons, but that each hospitalization related to his use of PCP. The motion pointed out that G.S.'s most recent official diagnosis of "Schizophrenia, Paranoid Type, Polysubstance Abuse" was ten years old and had been questioned by Dr. Stephen Lally and by a Dr. Filson in 1986.[10] The government argued that G.S.'s medical records should be excluded because: (1) they were inadmissible and unreliable hearsay; (2) any psychotic symptoms reflected in the record were limited to G.S.'s PCP use in the 1980's; (3) the diagnosis was questionable in that G.S. had functioned without active psychotic symptoms from 1996 through 1998; and (4) G.S. was not experiencing any psychotic symptoms at or near the time of the murder or trial in this case. Therefore, the government argued, cross examination concerning G.S.'s mental health history and drug use would have little, if any, probative value and be more prejudicial than probative.

Appellant responded that his expert, Dr. Michael Spodak, had concluded that the diagnosis of paranoid schizophrenia appeared to be well founded and that G.S.'s records from the Social Security Administration in May 1989 and January 1991 confirmed as much. Observing that there appeared to be a factual dispute between the experts, appellant proposed that the experts either examine G.S. or present their opinions based on available mental health records. Again, appellant sought

9. Appellant does not challenge the decision of the trial court to deny the experts an opportunity to examine G.S.

10. Dr. Filson wrote that "[G.S.] is not suffering from a treatable mental illness, except for

the acute phase of detoxifying him from his current state of PCP intoxication .... There is absolutely no evidence, in my opinion[,] that this patient suffers from an affective disorder or schizophrenia."

an opportunity to cross-examine G.S. about his mental illness and failure to take his medication, and to call Dr. Spodak to explain the significance of the diagnosis of schizophrenia.

The trial court held a hearing on August 22, 2000 to consider the motion and resolve the issue of the admissibility of testimony concerning G.S.'s mental condition. The court stated that the issue was not whether G.S. suffered from a particular mental illness, but "whether or not he was actively mentally ill such that it could impact his ability to observe or recall or relate events." The court stated that the focus should be on G.S.'s actual behavior and symptoms as opposed to the diagnostic labels. Defense counsel mentioned records that he sought to use dating back to examinations of G.S. on May 15, 1989 and January 21, 1991. He also wanted to use records from the Social Security Administration and St. Elizabeths Hospital. The trial court inquired of counsel about what the defense expert would say about the records of mental health professionals who had actually seen G.S. close in time to the murder, and the absence of any symptoms reflecting psychosis. Defense counsel responded that Dr. Spodak would likely say that the people in the out-patient clinics where G.S. was being treated are overworked, usually clinical social workers rather than trained psychiatrists, who do not conduct the in-depth examinations intended to find out whether a diagnosis is correct. Counsel proffered that Dr. Spodak says that they are concerned with "gross symptomatology," and whether the patient poses a threat to himself or others. Further, counsel said that Dr. Spodak would say that the control that G.S. exercised during visits to the clinic or his missed appointments could be consistent with someone with his diagnosis trying to guard against revealing too much about the problems that he was having.

The trial court continued to express concern that the defense would call Dr. Spodak to list the symptoms of paranoid schizophrenia when G.S. may have never experienced those particular symptoms. The court stated that such evidence would be prejudicial while "the lack of probative value there is pretty clear." The trial court deferred making a final determination, but it did make some preliminary observations. In that regard, the court stated that since G.S. had been found competent, it was not inclined to order a psychiatric examination for him. It found no basis for admitting into evidence his mental health or Social Security records. Further, the court stated that it did not think it irrelevant that appellant had been prescribed anti-psychotic medication and was not taking it at the time of the shooting, and that it expected that some limited cross-examination would be permissible.

### (c) Pre–Trial Ruling

Based on the evidence adduced at the hearings, the briefs and arguments of counsel, and the experts' reports, the trial court ruled that appellant was entitled to cross-examine G.S. "about the fact that he was receiving mental health treatment at the time [of the murder]; that he was a patient of a mental health center; that he was in fact mentally ill; that he was prescribed anti-psychotic medications; [and] that he was not taking those medications." The court also ruled that appellant could not use the label, paranoid schizophrenia, because it was "far more prejudicial than probative" in the absence of evidence of any active psychotic symptoms close to the time of the murder. The court found from the record that the times that G.S. actually exhibited psychotic symptoms were limited and related solely to the times that he had ingested PCP, a drug known for causing such symptoms. Further, the court found

that these incidents of PCP-related psychosis were remote in time to the murder and the trial, having occurred in the early 1980's. The court also observed that the mental health records from January, March, April, and June of 1997 reflected that G.S.'s condition was relatively stable and did not contain observations of psychotic symptomatology.

Further, the trial court ruled that the medical records were largely inadmissible hearsay, which, in any event, should not be required for use in impeaching G.S. since he did not deny that he was mentally ill. The court deferred a ruling on the admissibility of expert testimony until after G.S. testified. The court distinguished *Eiler v. State,* 63 Md.App. 439, 492 A.2d 1320 (1985), on which appellant relied, because, it involved a witness whose trial testimony revealed signs of "ongoing mental difficulty" and an inability to relate the facts.

Defense counsel inquired about exploring with G.S. whether his mental illness could cause delusions or hallucinations, and the trial court responded that it was "the actual symptoms and the actual behavioral manifestations that ... are the relevant issue." Therefore, the court ruled that defense counsel could ask G.S. whether he had suffered delusions or hallucinations within a time period reasonably close to the time of the murder; however, if G.S. denied it, counsel could not ask him whether these are the customary symptoms of this illness. Defense counsel contended that he should be permitted to call an expert to say that it was characteristic of schizophrenics to be "guarded" about their illness and to deny symptoms. The trial court did not think it appropriate for such information to be given in a vacuum without any examination of G.S.'s condition against evidence of his medical records that reflected no signs of psychotic symptoms. The court concluded that this concrete evidence of G.S.'s condition was more persuasive. The trial court also ruled that defense counsel could ask G.S. whether his mental illness affected his memory, but he could not suggest that the mental illness alone was reason to question G.S.'s memory or his veracity.

(d) *Evidentiary Rulings at Trial*

After G.S. had testified, defense counsel sought to call Dr. Spodak to testify that G.S. had been prescribed medications other than those that he identified while on the witness stand, and to explain the purposes for the medications. The trial court denied the request, explaining that it would be potentially misleading, given that Dr. Spodak had not seen G.S. clinically and did not know why the medicine had been prescribed for him. The court again noted the absence of active symptomology close to the relevant time period. The court explained again that such evidence would be more prejudicial than probative. The court observed that the jury had been provided with a fair presentation of the issues, explaining further that the evidence showed that:

> [G.S.] was given social security disability on the basis of his mental health condition or at least in part on the basis of his mental health condition. And ... he was supposed to be on medications at the time and that he was going regularly to see the outpatient folks. And he freely acknowledged having a long term mental health experience .... [I]n the absence of something more concrete, I don't see a basis for an expert to come in and muddy the waters.

B. *Applicable Legal Principles*

 We outline some of the legal principles that guide our consideration of appellant's claims that the trial court's rulings restricting his cross-examination of

G.S. and excluding his proffered expert's testimony violated his Sixth Amendment rights. "The Confrontation Clause of the Sixth Amendment protects the right of the accused in a criminal trial to confront and cross-examine the witnesses against him." *Velasquez v. United States,* 801 A.2d 72, 78 (D.C.) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) and *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)), *cert. denied,* 537 U.S. 963, 123 S.Ct. 396, 154 L.Ed.2d 319 (2002). Cross-examination provides an important means to test the credibility of the witnesses against the accused by exposing witness bias or any other reason for the witness not to be truthful. *Id.* at 79 (citing *Guzman v. United States,* 769 A.2d 785, 790 (D.C.2001)) (in turn citing *(Rocky) Brown v. United States,* 683 A.2d 118, 124 (D.C. 1996)). However, the right to cross-examination is not an unrestricted right to conduct the examination in a particular manner. *See Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (PER CURIAM). A trial court, consistent with the Confrontation Clause, may impose reasonable limitations on cross-examination in order to avoid "harassment, prejudice, confusion of the issues ... or interrogation that is only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431. The court may also limit cross-examination " 'where the prejudicial effect of the proffered evidence outweighs its probative value.' " *Guzman,* 769 A.2d at 790 (quoting *(Rocky) Brown,* 683 A.2d at 124 (in turn quoting *Elliott v. United States,* 633 A.2d 27, 32 (D.C.1993))). "After sufficient cross-examination has been allowed to satisfy constitutional requirements, the trial court retains broad discretion to determine the scope and extent of cross-examination." *Elliott,* 633 A.2d at 32 (citations omitted). We review the trial court's rulings placing limitations on cross-

examination for an abuse of discretion. *Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990).

### C. *Analysis*

Appellant argues that the trial court's rulings related to three areas violated his Sixth Amendment rights to confront the witness against him, to present a defense and to compulsory process. Specifically, he challenges the trial court's rulings: (1) precluding him from eliciting from G.S. that he was diagnosed as a paranoid schizophrenic; (2) precluding him from calling Dr. Spodak, a psychiatrist, to testify concerning the significance of that particular mental illness on G.S.'s credibility; and (3) refusing to permit appellant to cross-examine G.S. about his alleged military service to which G.S. had attributed his ability to identify firearms during grand jury testimony. Consistent with the general legal principles outlined in the preceding section, we consider each of appellant's challenges.

### (1) *Prohibition of Medical Label for Mental Illness*

■ We consider first appellant's argument that the trial court abused its discretion in not permitting defense counsel to elicit from G.S. on cross-examination that he was diagnosed with paranoid schizophrenia. He contends that permitting use of only the generic term, "mental illness," failed to educate the jurors about the impact of this particular illness on G.S.'s credibility. The government contends that the record supports the trial court's finding that the diagnosis of schizophrenia was of only marginal relevance to G.S.'s credibility and outweighed by the danger of unfair prejudice.

■ That a witness is suffering from a mental illness may have a bearing on the witness' credibility. *See Velasquez, supra,*

801 A.2d at 79 ("[E]vidence of a witness' mental illness may be relevant to both competency and credibility.") (citations omitted); *(William) Brown v. United States,* 766 A.2d 530, 538 (D.C.2001) (Ample precedents support admission of evidence of mental illness on the issue of credibility.) (citations omitted). However, this court has recognized that delving into a witness' " 'psychiatric history is an area of great personal privacy which can only be invaded in cross-examination when required in the interest of justice.' " *Velasquez,* 801 A.2d at 79 (quoting *United States v. Lopez,* 611 F.2d 44, 45 (4th Cir. 1979)). The extent of cross-examination permitted in this area, once constitutional requirements have been met, is within the trial court's discretion. *See id.* (citing *Elliott, supra,* 633 A.2d at 32). In exercising its discretion, the court must balance the potential for unfair prejudice against the probative value of the evidence. *Id.* (citing *Guzman, supra,* 769 A.2d at 790 (other citations omitted)).

■ Here, the trial court precluded the use of the diagnostic term for G.S.'s illness. In *(William) Brown, supra,* we stated that "[i]f the judge view[s] this nomenclature as unnecessarily alarming and prejudicial, it is within his discretion to require the use of less inflammatory terminology." 766 A.2d at 539. Here, the court ruled that appellant could not use the label, paranoid schizophrenia, because it was "far more prejudicial than probative," par-

ticularly absent evidence of any active psychotic symptoms close to the time of the murder or trial. In reaching its conclusion, the trial court gave appropriate consideration to factors relevant to that determination. Among the factors that the court should consider are "the nature of the psychological problem, the temporal recency or remoteness of the condition, and whether the witness suffered from the condition at the time of the events to which she [or he] is to testify." *Boggs v. Collins,* 226 F.3d 728, 742 (6th Cir.2000) (citing *United States v. Sasso,* 59 F.3d 341, 347–48 (2d Cir.1995)).

From a review of G.S.'s mental health records, the trial court found that the times that G.S. had actually exhibited psychotic symptoms were limited and related to periods when he had ingested PCP, a drug known for causing such symptoms. The record supports the trial court's conclusion. Although diagnosed with schizophrenia from the 1980's, multiple entries in G.S.'s records by medical doctors and nurse practitioners reveal that at least from 1992 through 1999, G.S. was not delusional or hallucinating, presented no psychotic symptoms, and was oriented as to person, place and time.[11] Thus, G.S.'s behavior (as distinct from the label for his illness) at or near the time of trial and the events about which he testified show no symptoms demonstrating or bearing upon his inability to observe, recall or relate accurately and truthfully his observations. Therefore, as the trial court determined,

---

11. These entries were in contrast to entries in the 1980's when the records show that G.S. was hallucinating regularly. The medical providers associated G.S.'s symptoms with his use of PCP at that time. In 1986, one psychologist concluded that he was "not suffering from a treatable mental illness, except for the acute phase of detoxifying him from his current state of PCP intoxication." In 1988, there was a diagnosis for "schizophrenia" and "multiple substance abuse"; in 1989, a time when G.S. claimed to have reduced or ceased the use of drugs, the diagnosis reflected as chronic paranoid schizophrenia or chronic undifferentiated schizophrenia. Based on medical evaluations done in 1993, more than three years before the crime involved here, an administrative law judge with the Social Security Administration found that G.S. suffered from "chronic schizophrenia with psychotic and paranoid symptomatology"; however, the administrative law judge checked on one of the forms that evidence of delusions was absent.

the recent records were of little, if any, relevance to the issues. Weighing the scant relevance of the evidence against the substantial prejudice of conveying, without evidentiary support, to the jury that G.S. was experiencing symptoms of the illness which were actually not present, the trial court could properly exercise its discretion to preclude use of the nomenclature for the illness. *See (William) Brown, supra,* 766 A.2d at 539.

▆ Appellant argues that the trial court did more than preclude use of the label for G.S.'s condition. He contends that the court precluded, but should not have, any reference to the psychotic episodes that G.S. experienced in the 1980's. As a result, he contends, there was no frame of reference for the jury to understand the severity of paranoid schizophrenia, particularly since G.S. testified that he was not experiencing auditory or visual symptoms. Again, the symptoms that appellant sought to elicit were so remote in time to the period relevant to this proceeding that it cannot be said that the trial court abused its discretion in foreclosing inquiry into this area. *See Velasquez, supra,* 801 A.2d at 80 (witness' mental condition three years after crime not relevant to her perception of events at the time of the assault); *United States v. Jimenez,* 256 F.3d 330, 343 (5th Cir.2001) ("[A] diagnosis of schizophrenia or a psychosis will be relevant, unless the diagnosis is too remote in time from the events alleged in the indictment.").

### (2) *Exclusion of Expert Witness' Testimony*

▆ Appellant argues that this court's decision in *(William) Brown, supra,* com-

pels the conclusion that the trial court erred in excluding the testimony of his expert witness, Dr. Spodak. He contends that Dr. Spodak should have been permitted to explain the symptoms, effects and characteristics of the mental illness from which G.S. suffered. Without this testimony, appellant contends, the jury had no explanation to connect G.S.'s mental illness to issues affecting his credibility.

In *(William) Brown,* this court held that it was error to exclude the testimony of an expert psychiatrist concerning the nature of the complaining witness' mental condition and the effects of her failure to take prescribed medication on the reliability of her testimony. 766 A.2d at 539–40. Unlike the present case, in *(William) Brown,* there was evidence that during the period relevant to her testimony, the witness had complained of auditory and visual hallucinations and depression for which she was prescribed, but did not take, her medication. *See id.* at 537. G.S.'s medical records revealed no such evidence at or near the times relevant to the events or trial in this case. The mental health professionals who observed G.S. between 1988 and 1997 saw no evidence of hallucinations, delusions or mental confusion even when he did not take his medication.[12] Therefore, this court's decision in *(William) Brown* does not support the conclusion that the testimony should have been admitted.

In light of the absence of any evidence that G.S. suffered delusions, memory problems or other symptoms affecting his ability to observe, recall and relate events at

---

12. An entry on G.S.'s medical records in 1995 shows that he was prescribed an antipsychotic medication, primarily Serentil "at lowest therapeutic dosage." While G.S. admitted not taking prescribed medication at the time

of the events pertinent here, the absence of symptoms of his illness for a long period of time and the prior association of PCP usage with his symptoms in the early years make this fact far less significant.

the relevant time, there was no factual predicate for the proffered expert's testimony. The expert could not say that G.S. experienced those particular symptoms at the times relevant to this case or that such symptoms resulted from his failure to take prescribed medication. Appellant argues that Dr. Spodak should have been permitted to provide an opinion based on the customary symptoms of paranoid schizophrenia and what generally happens when people with the illness fail to take medication for their condition. The trial court found that such evidence would be speculative and more prejudicial than probative.

■ Whether to admit or exclude expert psychiatric testimony is a matter within the trial court's discretion. *(William) Brown, supra,* 766 A.2d at 538 (citing *In re Melton,* 597 A.2d 892, 897 (D.C. 1991) (en banc)). Its decision to exclude such evidence should be upheld unless "manifestly erroneous." *Melton,* 597 A.2d at 897 (quoting *Coates v. United States,* 558 A.2d 1148, 1152 (D.C.1989)). The court did not abuse its discretion here. Appellant's expert had not examined G.S. He had no medical records evidencing symptoms that G.S. had at the times relevant hereto. Essentially, the expert would have explained the nature of paranoid schizophrenia as generally understood in the profession, and what might be generally expected as symptoms of the illness. Such generalizations would have been of marginal relevance and would have risked "injecting collateral and confusing questions into the proceedings and subverting the jury's credibility determination . . . ." *United States v. Butt,* 955 F.2d 77, 85 (1st Cir.1992) (affirming exclusion of expert testimony that "describe[d] tendencies only, cataloging a range of behavior that one so diagnosed might or might not, sometimes, exhibit"). We find no abuse of discretion in the trial court's decision excluding the testimony.

### (3) *Preclusion of Cross–Examination with Prior Inconsistent Statement*

■ Appellant argues that the trial court erred in precluding him from cross-examining G.S. about a false and inconsistent statement he made before the grand jury. Before the grand jury, G.S. testified that he could identify various weapons he saw at the shooting because he had been an Airborne Ranger in the army. The government concedes that the statement was false; however, it contends that it was not inconsistent with G.S.'s trial testimony. It argues also that the error, if any, was harmless.

Assuming that the witness' testimony in the grand jury was inconsistent with his trial testimony and that the trial court erred in precluding the cross-examination, we are persuaded that the error, if any, was harmless. G.S. was impeached with a prior conviction. He had to admit a lack of candor in seeking Social Security benefits. He admitted prior drug usage and assisting a drug dealer to secure drugs on the night of the offenses. He also acknowledged testifying pursuant to a plea agreement. If the jury was inclined to discredit G.S.'s testimony, it had sound reasons for doing so. Other inconsistencies in his testimony were shown. G.S.'s statement about his ranger experience would add little to all of this other evidence. At defense counsel's request, G.S. drew a picture of the weapon he saw appellant carry that night. The firearms expert testified that G.S.'s drawing looked like a semi-automatic weapon. Lucas and Ellis testified that appellant usually carried a 9mm handgun and that he carried such a weapon on the night of the offense. Considering these circumstances, the court's preclusion of an inquiry into the Airborne Ranger statement was harmless.

## III.

### Constitutional Challenges to Weapons Statutes

Appellant argues for the first time on appeal that his convictions of UPA and PUF should be vacated on constitutional grounds. Specifically, he contends that the statutes under which he was convicted effect an almost total prohibition on the possession of any type of firearm or ammunition by a citizen of the District of Columbia, and therefore, unconstitutionally infringe upon his rights under the Second Amendment and his due process and equal protections rights under the Fifth Amendment.

We have had occasion to reject as waived such belated constitutional challenges. *See Hager v. United States,* 856 A.2d 1143, 1151 (D.C.2004) (citing *Mitchell v. United States,* 746 A.2d 877, 885 n. 11 (D.C.2000)). However, even on the merits, appellant can not prevail because his challenges are foreclosed by this court's binding precedents.[13] *See Sandidge v. United States,* 520 A.2d 1057, 1058 (D.C.) (rejecting a Second Amendment challenge to the PUF and UPA statutes), *cert. denied,* 484 U.S. 868, 108 S.Ct. 193, 98 L.Ed.2d 145 (1987); *see also Hager,* 856 A.2d at 1151 (noting Second and Fifth Amendment challenges foreclosed by *Sandidge* and *Austin v. United States,* 847 A.2d 391, 393 (D.C.) (rejecting due process challenge), *cert. denied,* —— U.S. ——, 125 S.Ct. 185, 160 L.Ed.2d 161 (2004)).

For the foregoing reasons, the judgment appealed from here is

*Affirmed.*

---

13. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971) (No division of the court may

---

overrule another division; only the *en banc* court can accomplish that result.).